NEW JERSEY WELFARE RIGHTS ORGANIZATION et al., Plaintiffs,

v.

William T. CAHILL, in his capacity as Governor and Chief Executive Officer of the State of New Jersey, et al., Defendants.

Civ. A. No. 879-71.

United States District Court,
D. New Jersey.

Oct. 4, 1972.

Michael C. Parks, Gerard J. Clark, East Orange, N. J., for plaintiffs.

George F. Kugler, Jr., Atty. Gen. of N. J., by Stephen Skillman, Deputy Atty. Gen., for defendants.

## OPINION

CLARKSON S. FISHER, District Judge.

This case challenges those changes in New Jersey's Welfare Law which became effective on July 1, 1971. Both constitutional and statutory issues were raised. In June of 1971, a single judge, after considering plaintiffs' motion for a preliminary injunction against the institution of the disputed changes, granted a motion to dismiss proffered by the defendants. The plaintiffs then appealed and the Circuit Court of Appeals, 3rd Cir., 448 F.2d 1247, remanded the action to the District Court with instructions to allow plaintiffs additional time to complete their discovery and to convene a three-judge court to consider the constitutional issues. The three-judge court was convened on January 17, 1972 and its opinion has been separately filed today, D.C., 349 F.Supp. 491. The attack on the statutory portion of the action, delayed by problems of discovery between the parties, was heard by a single judge without a jury on June 6th, 7th and 9th, 1972. This opinion considers that aspect of the case.

The statute which plaintiffs specifically contend that defendants contravene by their alteration of welfare regulations is 42 U.S.C. § 602(a)(23) [1] as interpreted by the Supreme Court in the case of Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). That case held, in essence, that after July 1, 1969 a state participating in the Federal Aid to Families with Dependent Children (AFDC) Program could not lower its standard of need for recipients of aid under that program's auspices. It is such an illegal reduction in the content of the standard of need of New Jersey's AFDC recipients which plaintiffs claim has occurred by the institution of the changes of July 1, 1971.

The changes occurred as a result of Governor Cahill's desire to cut back on welfare abuses, to streamline the distribution of welfare to the state's needy citizens, and to increase the efficiency and lower the costs of the welfare system as a whole.[2] The Governor's Wel-

---

[1] "(The States shall) provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted."

The changes of July 1, 1971 affected three prior welfare programs, the C, F and N Segments. The C Segment was partially financed with federal funds as is its successor, whereas the F and N Segments have been supplanted by the Aid to Families of the Working Poor (AFWP) Program which is entirely state financed. Since only those programs for which the Federal Government provides money are subject to Federal statutory control, only the successor to the C Segment is subject to the requirements of 42 U.S.C. § 602(a)(23).

[2] Defendants have represented to the Court that a cost savings will be realized only through the elimination of the F and N Segments and the institution in their place of the AFWP Program. No savings will result from changes in the C Segment, those changes considered here.

fare Study Commission and his Task Force on Welfare Management both recommended that a consolidated flat grant payment system be adopted as a means for accomplishing this desired goal. It would be the culmination of gradual consolidations within the welfare system occurring over a period of years. Such flat grant consolidations were felt to give welfare recipients more control over their lives by eliminating second-guessing on expenditures by paternalistic welfare workers, to eliminate inequities among clients and between clients and non-clients, and to vastly increase efficiency in the administration of welfare. Prior to July 1, 1971, under the Manual of Distribution then in use, the Categorical Assistance Budget Manual (CABM), only one of the three categories of needs, personal and household needs, was met by a flat grant, which was determined by family size, composition and age of the eldest child. The other two categories, shelter and special circumstance grants,[3] were paid at cost, with the only limitation being that the costs were reasonable. Under the new system, distributed according to the Family Assistance Manual (FAM), all three need categories are given as a flat grant with almost no variations considered for actual cost.[4]

The consolidated flat grant was initially arrived at through use of a methodology known as Benchmark I. As part of this methodology the Division of Public Welfare ordered each of its county offices to send to Trenton the case sheets (PA3A Forms) for December 1970, of all files whose numbers ended in certain predesignated digits. In this way it was hoped that a random sample of approximately 5% of all welfare cases

could be collected and then all their component parts could be averaged. However, because of failure by certain county offices to fully comply with the Division's orders, a sample of only approximately 4% was received. The Division, however, proceeded to average all component parts of the returned case sheets.

Averages were obtained by adding the total amount of expenditures per need category and dividing by the number of family budget units of the same size. For instance if there was a total of $120,000 spent in one month for shelter by all families of four in the sample and there were 1,000 such families, the amount to be allotted per family was $120 per month. If the average personal and household need of all families of four in the sample was $180 per month, and the average special circumstance grant for such families was $20 per month,[5] these two figures would be added to the $120 shelter figure and all recipient families of four would receive a check each month of $320. In addition a "creeping factor" to account for rises in the cost of living between the time of the study and the institution of the FAM, was added in. It amounted to fifty cents per person per month. In this manner a separate average was taken for each family size. The FAM merely listed the total amount to be given to each family varying in amounts only according to family size, without breaking it down to the three need categories plus the "creeping factor".

In computing the averages under Benchmark I, only the actual amounts paid per family budget unit size was recognized in the averaging process. No attempt was made to separately compute the rent of those families living in pri-

3. For example rental deposit, utility deposit, Blue Cross, catastrophe, child care, extermination, training, garbage service, homemaker, keys, insurance, moving, indebtedness, taxes, home repairs, sewer, storage, telephone, special diet, transportation etc.

4. As will be discussed later, there are four types of special circumstance grants

still given at cost: grants for homemaker service, for child care, expenses for training, and those for emergency assistance.

5. Special circumstance averages were computed on a per capita basis rather than by family budget unit. The per capita figures were then added to determine special circumstance budgeting per family size.

vately owned housing as opposed to those living in public housing, and whose rents would therefore be cheaper. Again no attempt was made to separate a family from Bergen County which might be paying $180 per month for rent from one from Salem County which might be paying $75 per month. Nor were people who needed no special circumstance grants separated from those who had large special needs such as special diets, etc.

The advantages in terms of administrative efficiency to be gained as a result of this flat grant consolidation are readily apparent. A welfare worker no longer had to worry whether a client's rental was reasonable or whether he or she needed special circumstance items and how much should be allotted for them. All the worker had to do was determine the size of the recipient family and then look at the FAM to find out how much that family should receive. The client, too, would know exactly how much he would receive and budget expenditures accordingly. He would not have to, nor would he be able to, run to the Welfare Department every time a need arose.

Benchmark I was partially modified by an Expanded Study conducted after the remand of this case. It was done at the prompting of the Department of Health, Education and Welfare (HEW) which, although accepting the concept of averaging, did not feel that the study conducted pursuant to Benchmark I was extensive enough to ensure the proper averaging of a technically sufficient sample.

The methodology of the Expanded Study was similar to that used in Benchmark I except that instead of only one month's PA3A forms being studied and averaged, samplings of four months were collected. The four months, June 1970, September 1970 and March 1971, in addition to the original December 1970 study, constituted, according to HEW, a more adequate basis for accounting for possible geographic and seasonal factors affecting the averaging process.

Additionally, instead of averaging all payments according to family budget unit size as they were paid prior to July 1, 1971, regardless of all other factors which may have previously been considered in figuring the amount of that payment, certain discriminations were accorded to the averaging process in the Expanded Study. Under Benchmark I the shelter cost for all families in each family size were averaged whether the families were "square" or "non-square".[6] Since "non-square" families were assisted in payment of rent by the person or persons within their living unit not on welfare, such families' shelter needs under the CABM were proportionately lessened and including them in the averaging process had a tendency to depress the final average. Non-square families were not averaged in the Expanded Study. In Benchmark I figures from all segments, C, F and N were averaged together for all three need categories, whereas in the Expanded Study, the N Segment was eliminated from calculations for personal and household needs and for shelter, although not from special circumstance averages. The rationale for this difference, according to the defendants, was that the N Segment had been wholly financed by the State and assistance criteria for families under its auspices differed from those in the C and F Segments. Special circumstance grants were computed on an individual basis and criteria under all segments did not differ for that category. Another difference between Benchmark I and the Expanded Study was that in the former all special circumstance grants were considered in the averaging, whereas in the latter study four such grants were excluded from the averaging. The four, homemaker service, child care, expenses

---

6. "Square" families are those in which all persons in the household are in the welfare eligible unit; "non-square" families have one or more household members who are not on welfare.

of training, and emergency assistance will continue to be paid for at cost.

The results of the Expanded Study tended to corroborate the correctness of Benchmark I. Although the average four special circumstance grants rose from forty-eight cents per month per person to seventy-five cents, the only change in final averages was that computed for a family of five, for which it was determined that the proper flat grant payment should be $370 rather than $360 per month. An amendment to this effect in the FAM was instituted by the defendants on July 1, 1972.

Plaintiffs, who allegedly represent those AFDC recipients who receive less money under the FAM than under the CABM, quarrel with both Benchmark I and the Expanded Study both as to technical statistical methodology and as to the component figures used in the averaging process. They claim that Benchmark I was technically deficient mainly for the same reasons that prompted HEW to request the Expanded Study: it was too narrow in scope and the county returns were inconsistent. However, since the present FAM is the product of the Expanded Study, arguments against Benchmark I are moot.

Plaintiffs claim that averaging of shelter across the state is per se illegal since shelter costs vary greatly in different counties. They claim that artificially limited data, such as rent for recipients living in public housing, should not have been figured in the averaging. They further claim that the requirement under the CABM to pay shelter and special circumstance needs at cost contained a built-in cost of living increase requirement, which is now eliminated under the FAM. Plaintiffs contend that averaging of non-recurring special circumstance grants (i. e. moving expenses) is also per se illegal, as is averaging special circumstance grants from certain counties where it appears that figures for such grants were inordinately low and probably improperly distributed. Plaintiffs further contend that determination of a mean through averaging

should not be the focus but there should rather be an assessment of typicality. The question should be, according to plaintiffs, what amount does the typical recipient receive, rather than have a mean which is altered by the extremes. In essence, the plaintiffs say that the defendants, in undertaking the project of consolidation from the former components of the CABM into the FAM's flat grant, did not consider the quality of the data used, did not consider significant aspects of the former standard of need, and did not take into account harm to recipients and reductions in needs. In this way they contend that the defendants have violated 42 U.S.C. 602(a)(23) as interpreted by *Rosado, supra.*

The plaintiffs admit that the Supreme Court in *Rosado* did allow averaging of grants to AFDC recipients. However, they note that the Court allowed only *fair* averaging using figures that are *fairly* priced. Specifically, the Court said:

"Section 402(a)(23) (42 U.S.C. 602 (2)(23)) invalidates any state program that substantially alters the content of the standard of need in such a way that it is less than it was prior to the enactment of § 402(a)(23), unless a State can demonstrate that the items formerly included no longer constituted part of the reality of existence for the majority of welfare recipients. We do not, of course, hold that New York may not, consistently with the federal statutes, consolidate items on the basis of statistical averages. Obviously such averaging may affect some families adversely and benefit others. Moreover, it is conceivable that the net payout, assuming no change in the level of benefits, may be somewhat less under a streamlined program. Providing all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging, a State may, of course, consistently with § 402(a)(23) redefine its method for

determining need." 397 U.S. at 419, 90 S.Ct. at 1221, 25 L.Ed.2d at 459.

Much of the outcome of this case turns on the interpretation given to the above paragraph.

In *Rosado, supra,* the Supreme Court reviewed an attempt by New York State to convert its prior system of distribution of welfare aid into a flat grant system such as that before this Court. The *Rosado* Court held that New York violated 42 U.S.C. 602(a)(23) in that it did not include certain special needs in its averaging process and thereby impermissably lowered the content of its prior standard of need.

En route to rendering its decision, the Supreme Court in *Rosado* explored the legislative history of Section 602(a)(23) and reached some conclusions as to the purpose which Congress intended that section to serve and the interpretation that it should be given in the future.

The Court, noting that Section 602(a)(23) was a child of legislative compromise, Congress having rejected plans to require annual updating of the participating state's standard of need, determined that that section had two main purposes:

> "First, to require States to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need; second, to prod the States to apportion their payments on a more equitable basis." 397 U.S. at 412–413, 90 S.Ct. at 1218.

The Court emphasized that Section 602(a)(23) does not force states to spend more money nor prohibit them from spending less on their public assistance programs. It concerns standards of need rather than levels of payments. After enumerating the two main purposes of Section 602(a)(23), the Court continued:

> "(A) State may, after recomputing its standard of need, pare down payments to accommodate budgetary realities by reducing the percent of bene-

fits paid or switching to a percent reduction system, but it may not obscure the *actual* standard of need." (Emphasis in text) 397 U.S. at 413, 90 S.Ct. at 1218.

■ The standard of need is thus to be considered separate from the level of payment. The standard of need is the State's yardstick for stating need and measuring whether any particular family is needy and therefore eligible for assistance. States have been given a great deal of leeway both in determining the standard of need within the state and the amount of that need which will be met through public assistance. *Rosado, supra,* at 408, 90 S.Ct. at 1215.

■ New Jersey purports to pay its recipients 100% of their need although there is no federal requirement for doing so. *Rosado* only requires that the standard of need cannot be reduced, not the attempts by the state to meet that standard.

Yet Section 602(a)(23) was not to be a meaningless exercise in bookkeeping. By forcing the standard of need to remain unaltered and unobscured while the levels of payments could be reduced the Court said that Congress ultimately hoped to require the states "to recognize and accept the responsibility for those additional individuals whose income falls short of the standard of need as computed in light of economic realities and to place them among those eligible for the care and training provisions" and to force a State which cuts back on its level of benefits "to accept the political consequence of such a cutback and (bring) to light the true extent to which actual assistance falls short of the minimum acceptable". 397 U.S. at 413, 90 S.Ct. at 1218.

It is plaintiffs' contention that defendants have altered the standard of need through an improper averaging process and then obscured the actual standard of need by denying any alterations and by claiming that the new standard is as indicative of the same minimal needs as the old.

Discussion of these charges requires a comparison between the standard of need in existence prior to July 1, 1971 with that under the FAM, both of which were figured on different bases, one on meeting individual needs and one on a flat grant. The District Court on remand in *Rosado*, 322 F.Supp. 1173, 1180 (E.D.N.Y.1970), termed the process "comparing base year apples with current year pears".

The relationship between the two standards was, of course, the conversion of one into the other through averaging. Any discussion thus must start with a consideration of that process.

## A. METHODOLOGY

■ Plaintiffs initial concern with methodology is with the concept of a consolidated flat grant in itself. Although conceding that it can be legal plaintiffs argue that it has a great potential for obscuring the standard of need.

It is true that under a consolidated flat grant system an individual's personal standard of need is no longer fully considered; however, there are definite advantages to such system which outweigh defects both in regard to policy and law. A consolidated flat grant system, besides being specifically approved by the Court in *Rosado*, has the advantage of eliminating welfare paternalism, creating a certainty as to the amount of monthly payment and helping to eliminate inequities in welfare distribution, a goal of Section 602(a)(23) according to the Court in *Rosado*. Furthermore, instead of obscuring the standard of need it would seem to further clarify it. Instead of computing various budget figures and expenses subject to subjective standards of reasonableness a needy individual need only look at one figure to determine if he is eligible for assistance, a far simpler process.

■ The selection of cases to be used in computing averages for consolidation was done by the process of random sampling, a process specifically approved in numerous cases, including the *Rosado* opinion of the District Court after remand, 322 F.Supp. at 1180.

Although Benchmark I was determined to be inadequate there has been little dispute as to the technical sufficiency of the Expanded Study. The standard deviation and standard error tables for the data compiled under the Expanded Study are as follows:

From December 1970 Data

STANDARD DEVIATIONS

| Family Budget Unit Size | Shelter (a) | Personal and Household Needs (b) | Special Circumstances (c) |
|---|---|---|---|
| 2 | $30.74 | $11.96 | $ 6.51 |
| 3 | 33.62 | 21.28 | 7.27 |
| 4 | 35.50 | 20.44 | 6.37 |
| 5 | 37.28 | 23.54 | 4.92 |
| 6 | 39.87 | 35.64 | 2.09 |
| 7 | 35.92 | 18.49 | 2.78 |
| 8 | 35.21 | 21.68 | 0.72 |
| 9 | 39.50 | 31.78 | 1.10 |
| 10 | 25.50 | 11.31 | 4.57 |
| 11 | 41.11 | 12.65 | 9.85 |
| 12 | 39.24 | 9.28 | 3.86 |

STANDARD ERRORS

| Family Budget Unit Size | Shelter (a) | Personal and Household Needs (b) | Special Circumstances (c) | Total (d) |
|---|---|---|---|---|
| 2 | $ 1.17 | $ 0.45 | $ 0.20 | $ 1.27 |
| 3 | 1.15 | 0.72 | 0.22 | 1.37 |
| 4 | 1.35 | 0.77 | 0.21 | 1.57 |
| 5 | 1.80 | 1.13 | 0.20 | 2.14 |
| 6 | 2.36 | 2.07 | 0.10 | 3.14 |
| 7 | 2.65 | 1.34 | 0.16 | 2.97 |
| 8 | 3.67 | 2.26 | 0.02 | 4.31 |
| 9 | 4.86 | 3.83 | 0.10 | 6.19 |
| 10 | 1.52 | 2.14 | 0.65 | 2.70 |
| 11 | 2.91 | 2.76 | 1.62 | 4.32 |
| 12 | 13.89 | 3.10 | 0.97 | 14.25 |

(a) C and F segments, square families, excluding shelter provided
(b) C and F segments, square families
(c) Includes all families, deviations about FBU times per person mean
(d) Square root of sum of squared standard errors

The larger the family the smaller was the sample size and the less the accuracy of the computations for those groups. However, the Department of Health, Education and Welfare deems the entire study to be adequate and on technical subjects this Court will rely heavily on HEW's expertise, see *Rosado, supra* 397 U.S. at 407, 90 S.Ct. at 1215, 25 L.Ed.2d at 452; *Rosado*, 322 F.Supp. at 1186, and approve the methodology of the Expanded Study.

Plaintiff's major contention in the statistical area is that the chief concern of the consolidation process should have been the typicality of the results rather than the mean. Under this view, for example, an extremely low rent would not have the same impact on the final shelter figure as it would if a mean were computed. None of plaintiffs' witnesses, however, made a study of the effect the use of typicality would have on the figures used in computing the FAM. Only Dr. John Dall of the Office of Research and Evaluation for the State of New Jersey conducted such a study. He found that in every instance he studied the mean was higher than the figure representing typicality, so using the typicality figure would work to the disadvantage of AFDC recipients.

Additionally, there is nothing in *Rosado* suggesting the use of typicality rather than mean, and plaintiffs' contention in this regard is therefore rejected.

Having approved the technical averaging process, it is now necessary to consider the effect of the averaging on the three need categories.

## PERSONAL AND HOUSEHOLD NEEDS

Personal and household needs was the one need category under the CABM in which money was budgeted according to a consolidated flat grant system rather than as to actual costs. The criteria considered in determining budgeted personal and household needs were family size, age of the eldest child, the number of adults in the family and the number of persons in the household who were receiving assistance. Under the FAM, variables relating to the age of the eldest child and number of adults in the family were eliminated as personal and household needs were averaged without regard to those differences.

HEW, in its brief to this Court, points out the regulation in 45 C.F.R. 233.20(a)(2)(iv) requiring a state to use one of three methods described in HEW guidelines for determining needs. In neither of the three methods are age differentials recognized as a legitimate variable for determining need.

Nothing in *Rosado* warrants overruling this regulation. On the contrary, New York had similarly eliminated age variables in its consolidation, yet the *Rosado* Court made no mention of such action as violative of Section 42 U.S.C. § 602(a)(23). I find no illegality either.

## FAIR PRICING AND AVERAGING: SHELTER AND SPECIAL CIRCUMSTANCE GRANTS

Plaintiffs' major contentions concern the averaging of shelter and special circumstance grants, claiming that the averaging in both categories as they were conducted, violated the requirement in *Rosado* for fair averaging using fairly priced data. It is therefore necessary, prior to discussing the specifics of the shelter and special circumstance averaging, to consider exactly what was meant by the terms "fairly priced" and "fair averaging".

■ Prior to the Supreme Court's decision in *Rosado*, there was no statistical concept such as fair averaging, and there has been a debate ever since over its meaning. Plaintiffs urge the Court to give it a qualitative interpretation, that fair averaging requires the components of the averages to be fairly selected. The Court would thus have to consider, for instance, whether it was "fair" for shelter payments to public assistance recipients in public housing to be averaged in with those paying higher non-public housing costs. Most of plaintiffs' contentions with regard to the averaging of shelter and special circumstance allowances depend upon this Court's acceptance of such a qualitative interpretation of fair averaging. This view, however, must be rejected as I am convinced that the Supreme Court did not intend to give Federal Courts such broad power of review over state welfare programs.

The Supreme Court apparently intended the term "fair averaging" to apply to the technical statistical process rather than to any qualitative review of the components of the averages. The clause in *Rosado* regarding fair averaging indicates that interpretation: " . . .

providing the consolidation *on a statistical basis* reflects a fair averaging . . . ." (Emphasis added) 397 U.S. at p. 419, 90 S.Ct. at 1221.

The District Court on remand in *Rosado*, apparently had the same view of fair averaging as it considered its application only to the technical statistical process. HEW in its brief to this Court likewise referred to fair averaging technically rather than qualitatively. Even one of plaintiffs' witnesses, Dr. Bernard Indik, a professor of social work at Rutgers University, referred to fair averaging in a technical manner, believing it to require that final data reflect typicality. Although his specific point was rejected as a matter of law, it is apparent that he did not share plaintiffs' view regarding the qualitative analysis of the components used in averaging.

Plaintiffs have attacked the averaging of non-recurring special circumstance grants as an unfair averaging and if fairness in *Rosado* were meant to be subjectively applied, a Court would have to consider the pros and cons of such averaging and generally decide policy. As can be seen from the types of specials under discussion, the Court in *Rosado* also considered the averaging of non-recurring specials, yet it did not discuss the pros and cons of such averaging. It merely concluded that New York had violated Section 602(a)(23) by excluding such specials from its averaging. It did so without considering the advisability of such averaging, a further indication that it never meant fair averaging to be considered subjectively.

A subjective interpretation of fairness would give courts extremely broad powers over a state's public assistance program. A Court, without possessing any expertise in the field of public assistance, could, based on its own notions of fairness, force a great many changes in a State's program. It is wholly inconceivable that the same Supreme Court which recognized that Section 602(a)(23) was a product of legislative compromise, further recognized the great amount of leeway that Congress has al-

lowed the State in formulating welfare policy, and which on the same day that *Rosado* was decided, also issued its decision in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), recognizing that such questions as advisability, morality and intelligence of their welfare policy are matters for the states, would give Courts such broad powers to interpret what is "fair". It is also inconceivable that in an opinion apparently designed to give future courts definitive guidelines for interpretation of Section 602(a)(23), the Court would employ such a vague concept as qualitative fairness. Therefore, such view is rejected.

■ Likewise, in regard to fairly priced data, plaintiffs urge a qualitative interpretation on the Court, one calling for subjective analysis. A court would have to determine, according to plaintiffs, what data should be considered in the averaging process and what should be eliminated as artificially limited in price or in some other way not fully representative of market price or some ideal or "fair" price. Shelter payments to recipients living in public housing would thus be eliminated from averaging since they do not represent full market price.

Again I disagree with plaintiffs' interpretation; "fairly priced" does not mean what the price would be by market standards or what would be required for a decent existence,[7] but rather by what the price actually is.

A view of the relevant language in *Rosado* is instructive. The Court said: "Providing all factors in the old equation are accounted for and fairly priced . . .", 397 U.S. at 419, 90 S.Ct. at 1221. *Each* factor in the old equation must be accounted for. That includes public housing as well as the most expensive housing. This could only mean that they must be accounted for at their actual prices, since accounting for public housing at some non-existent market price makes no sense. Thus, if rent for public housing is $50 per month for a family of four in one county and in another the rent is $180 per month, both figures should be included in the averaging as is.

By the words "fairly priced" the Supreme Court was apparently trying to prevent a state, barred from totally eliminating a factor from the content of its former standard of need, from artificially pricing an item so low that that item would essentially be eliminated in terms of reality. For example, a special circumstance item such as a telephone, normally priced at about $4.50 per month, cannot be represented in the averaging process at a cost of $1.00 per year. It would not be a fully considered need item. See, Rhode Island Fair Welfare Rights Organization v. Department of Social and Rehabilitative Services, 329 F.Supp. 860, 867 (D.R.I.1971).

The plaintiffs' interpretation of "fairly priced" would require reviewing every figure to determine which, if any, was artificially limited, and what would be the price for subsidies etc. This would be an almost insurmountable task. Accepting "fairly priced" to mean cost as it is, on the other hand, fits the context of *Rosado*, and is the simplest for the states and the courts to follow, requiring the least amount of second guessing by the judiciary.

■ In a conversion to a consolidated flat grant system, Section 602(a)(23) and *Rosado* thus require only that no portion of the prior determinants of need be left out of the averaging process or be priced below actual cost in such figuring and further that the averaging itself be statistically sound.

---

7. Plaintiffs' attempts to show that a great number of welfare recipients in New Jersey live in substandard housing is an attempt to convince the Court that the allowances for shelter are not fairly priced. Yet however tragic the abundance of substandard housing in New Jersey may be, there is nothing in Section 602(a)(23) or in *Rosado* indicating that Congress meant that statute to cure all the ills of poverty. Substandard housing existed under the CABM as it does under the FAM.

■ The discussion above obviates detailed consideration of many of the specific arguments by the plaintiffs in regard to the averaging of shelter and special circumstance items, since most of those arguments concern subjective notions of fairness in averaging and in pricing. Thus this Court rejects plaintiffs' objection to the use of public housing figures in averaging shelter, as well as their contention that shelter should be administered solely on a regional basis. Nothing has been left out of the averaging, nor has anything been priced at less than actual cost. HEW has informed the Court that if at all feasible it recommends that identical cost standards should be used statewide. Nothing in Section 602(a)(23) or in *Rosado* seems to require the negating of this policy.

■ In the special circumstance area, the objection to averaging non-recurring specials is likewise rejected. *Rosado* only requires that if such specials are no longer met at cost they be subsumed in the average. New Jersey still pays for four such grants at cost, whereas all other specials existing under the CABM are now averaged in the FAM. Averaging of non-recurring specials, if not specifically approved by the Supreme Court is here approved.

■ One area which does cause some difficulty is the averaging of specials from certain counties appearing to be priced inordinately low, which plaintiffs say is the result of improper or illegal distribution under the CABM. The problem is in determining whether those specials are fairly priced.

If it could be proven that special grants which were known to be needed and were granted but at a lower price than cost, the *Rosado* requirement for fair pricing would be violated. The reason is that since under the CABM needs were met at cost, need equalled cost. So if an item was accounted for in the averaging at less than cost, the need was not fully taken into account either. If, for example, under the CABM a person

had a need for a telephone at $4.50 per month but only received $2.00 per month, that data is not fairly priced. The difference between such averaging and the averaging of public housing in the shelter consolidation is that with the latter a need item of certain aid recipients is fully accounted for. It would not be in the hypothetical presented. However, plaintiffs did not prove that this is actually what happened.

It is more likely that certain counties had low special circumstance payments as a result of differing views as to what constituted eligibility for any such grant, that is, as to who was entitled to a special circumstance grant in the first instance. Some counties may have been more conservative than others and some more liberal. There is no way to presently determine who in the past had a special need and should have received a grant but did not, just as it is impossible to determine who was considered to have a need, received a grant, but did not deserve one. In this circumstance it is necessary to assume that those persons receiving special grants were eligible for them and those who did not were not eligible, and the data must stand as is.

HEW computed its own averages of special circumstance grants, leaving out the two counties with the lowest special circumstance grant figures. The influence of leaving these two counties out on the final average was negligible, so there is no need to force any studies as to what might have happened under the CABM.

## "CREEPING FACTOR"

Under the CABM both shelter and special circumstance items were paid for at cost. If the cost of any item within these two need categories rose as a result of a rise in the cost of living then that additional amount was paid for in public assistance grants. Thus there was a built-in method of adjusting AFDC benefits with increases in the cost of living.

With the change over into the flat grant system a "creeping factor" of 50¢ per person per month was added into the averages obtained from the December, 1970 survey to reflect expected increases in the cost of living between that date and the institution of the FAM. No provision, however, for cost of living increases after July 1, 1971 is incorporated into the FAM, and thus plaintiffs contend it has been eliminated in the changeover.

■ There are certain changes inherent in the conversion from a payment schedule meeting needs at cost into a flat grant system, one of which is that any built-in cost of living barometer is eliminated. It is not so much an elimination of a need item, part of the content of the former standard of need, as it is the elimination of a quality of the former system in itself. Similarly, in the conversion to a consolidated flat grant system individual needs for all but four special circumstance grants are no longer considered, yet this cannot be regarded as an elimination of an individual need factor from the content of the former standard of need. If it were so regarded then no flat grant system could ever be used. Yet the Court in Rosado specifically approved conversions to a flat grant system.

New York, like New Jersey, also converted to a flat grant system from one in which certain needs were met at cost. No material has been presented to this Court showing that New York has accounted for cost of living increases in its new system, yet the New York system has been thoroughly reviewed in *Rosado* from the District Court to the Court of Appeals to the Supreme Court and on back to the District Court on remand without any hint that New York has in this way violated Section 602(a)(23).

In its review of the legislative history of Section 602(a)(23) the Supreme Court noted that the bills which were rejected prior to the passage of Section 602(a)(23) could have required annual cost updating of need items by the states, but that Section 602(a)(23) only required an updating by July 1, 1969. No additional cost of living changes are required by law, and New Jersey cannot be forced to make such changes as a requirement for compliance in the Federal program.

## SUMMARY

The defendants have represented to this Court that New Jersey will not save money in its AFDC program as a result of its conversion into a flat grant system. The money saved will result from the elimination of the F and N Segments and the institution of the wholly state financed AFWP Program which is not subject to federal statutory control.

Since New Jersey always purported to pay 100% of need monetary costs equaled need. The fact that the FAM will not result in lower costs to the State is also thus indicative that it has not reduced its standard of need either. It has merely redefined its method of distributing its public assistance payments and has redefined its method of determining need. It has not lowered the content of its standard of need and has not violated Section 602(a)(23).

Some individuals have been hurt by this redefinition, yet as a matter of law, the Supreme Court made it clear that no federal legal requirements are thus violated. Whether the State is willing to accept the political consequences of harming such individuals, in light of the fact that others are benefited by an averaging, is a matter of policy for the states and not a matter of law for the courts.

This Court has found no violations of law in New Jersey's conversion of its AFDC Program into a flat grant system. These counts of the Complaint will therefore be dismissed and an order will be submitted.