**NEW JERSEY WELFARE RIGHTS ORGANIZATION et al., Plaintiffs,**

**v.**

**William T. CAHILL, in his capacity as Governor and Chief Executive Officer of the State of New Jersey, et al., Defendants.**

**Civ. A. No. 879–71.**

United States District Court,
D. New Jersey.

Oct. 4, 1972.

---

See also D.C., 349 F.Supp. 501.

Michael C. Parks, East Orange, N. J., Gerard J. Clark, for plaintiffs.

George F. Kugler, Jr., Atty. Gen. of N. J., by Stephen Skillman, Deputy Atty. Gen., for defendants.

Before GIBBONS, Circuit Judge, and WHIPPLE and FISHER, District Judges.

## OPINION

CLARKSON S. FISHER, District Judge.

This is a class action brought by the New Jersey Welfare Rights Organization and others seeking to have segments of the New Jersey Law N.J.S. 44:13–1, entitled "Assistance to Families of the Working Poor" (AFWP), declared unconstitutional. It is part of a broader action in which plaintiffs additionally attack certain other revisions of New Jersey's Welfare law on statutory grounds. Both the AFWP and the other revisions which are the subject of this action went into effect on July 1, 1971. The suit was first filed on June 15, 1971 and was dismissed by a single District Judge after a hearing of four days. Appeal was then taken to the Third Circuit Court of Appeals, 448 F.2d 1247, which remanded the case to the District Court with instructions that a three-judge court be convened pursuant to 28 U.S.C. §§ 2281, 2284, to consider those parts of the complaint alleging constitutional infirmities. The three-judge court was convened on January 17, 1972 at which time witnesses were presented on behalf of each side.

The AFWP, a program designed to supplement the income of families with children when independent sources of income are inadequate for family support, is completely state financed [1] and as a result, is not subject to federal statutory controls but rather only to the requirements of the Federal Constitution. Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Plaintiffs thus make no statutory claims but deem the Program to be constitutionally unsound for four reasons: [2]

1. Eligibility for assistance under the AFWP Program requires that the family must be one in which both parents are in the home, are ceremonially married to each other, and in which both parents are the natural or adoptive parents of children in the home. This, the plaintiffs contend, arbitrarily, capriciously and without any rational basis, discriminates against needy illegitimate children who live with their parents. They further contend it is a discrimination against unmarried parents who live with their children, and as such is a violation of the Equal Protection Clause of the Fourteenth Amendment.

2. The AFWP as a program to supplement income to meet needs uses "adjusted gross income" as the figure representing the family's income prior to the receipt of aid. Adjusted gross income is defined as the gross income of all employed individuals within the family less the first $60.00 earned by each such member, disregarding the income of a minor child under sixteen or under eighteen if he or she is attending school on a full time basis. This, the plaintiffs say, does not take

---

1. Prior to the enactment of the AFWP legislation, there were two programs in New Jersey providing aid to the under-employed. One was the "N Segment" which, like AFWP, was entirely state financed. The other was the "AFDC–UP" program, a federal program established by Sec. 407 of the Social Security Act, in which New Jersey had been participating. The "N Segment" terminated on its own as time for the law's expiration was reached. New Jersey ceased participating in the "AFDC–UP" pro-gram at the end of June 1971 at the direction of the Legislature.

2. The plaintiffs originally claimed only three grounds for challenging the constitutionality of the AFWP, and these were embodied in Counts 7, 8 and 9 of their Complaint. At the pretrial conference held on December 15, 1971, they were permitted to amend their complaint to add an additional count, which then became Count 10.

into account withholding taxes, social security taxes, court ordered support payments, etc. By failing to consider those deductions individually, the law assumes that the $60.00 deduction is enough when it might not be. Thus, say the plaintiffs, the AFWP has created an irrebuttable presumption in violation of the due process clause of the Fourteenth Amendment to the United States Constitution.

3. Although admitting that New Jersey welfare regulations do provide procedural means whereby a recipient of AFWP has an opportunity to be heard prior to the reduction or termination of AFWP assistance, plaintiffs contend that these procedures are inadequate to comply with the requirements for due process as defined by the United States Supreme Court in Goldberg v. Kelly, 397 U.S. 254, 90 S. Ct. 1011, 25 L.Ed.2d 287 (1970) and therefore violates the due process clause of the Fourteenth Amendment.

4. Plaintiffs argue that there is less likelihood that eligibility requirements for AFWP assistance will be met by Blacks than by Whites since there is more illegitimacy and non-ceremonially sanctioned marriages amongst Blacks than Whites. As a result, the plaintiffs contend, the eligibility requirements for AFWP work a *de facto*, if not *de jure*, discrimination against Blacks and are thus in violation of the equal protection clause of the Fourteenth Amendment of the Constitution of the United States.

Jurisdiction for this Court to consider the merits of these contentions is found in 28 U.S.C. § 1343.[3]

We will thus discuss Counts 7, 8 and 10 of the Complaint. Count 9, however, involving the procedural due process question in light of Goldberg v. Kelly, *supra*, was neither briefed nor argued by the parties. There has been a representation made to the Court that the State of New Jersey is in the process of altering its regulations in this area, and we will assume that this count has been dropped.

I

In Count VII of the Complaint, plaintiffs argue that the AFWP requirement that only ceremonially married parents living with their natural or adoptive children can be eligible for assistance under the Act, is a violation of the constitutional mandate that laws be equally applied. This law, they claim, denies that protection both to illegitimate children and their unwed parents.

No contention is made that the equal protection clause absolutely prohibits a state from making classifications of people and applying the law differently between them. The rules for measuring classifications under state social legislation against the equal protection requirement of the Federal Constitution, were summarized by the Supreme Court in Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct.

3. Defendants had originally contended that this statute could not be used to provide jurisdiction in this matter. In making this argument they relied on the concurring opinion of Justice Stone in Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), as adopted by the Third Circuit Court of Appeals in National Land and Investment Co. v. Specter, 428 F.2d 91 (1970). Justice Stone argued that Section 1343 could be used as a jurisdictional basis only for suits involving claimed deprivations of liberty but not for alleged deprivations of property. The defendants contended that matters involving welfare are matters of property and that the court should have rejected jurisdiction.

After the hearing in this case the Supreme Court issued its opinion in Lynch v. Household Finance Company, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (decided March 23, 1972), where it rejected the liberty-property distinction under S. 1343. Thereafter, in letters to each of the members of the Court, the defendants conceded jurisdiction.

337, 340, 55 L.Ed. 369 (1911), as follows:

"1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary.

2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality.

3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.

4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary."

These same rules have been adopted when the classification is with respect to recipients of welfare assistance. In Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the Supreme Court said, "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect . . . A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." 397 U. S. at 485, 90 S.Ct. at 1161.

*Dandridge, supra,* involved a challenge to Maryland's maximum grant regulation whereby the family's standard of need increased with each additional person in the household, but the increments became proportionately smaller until a maximum grant entitlement was allotted no matter what size the family became. This was claimed to deny equal protection to new-born members of the family, but the Supreme Court held that the state, with limited resources, had a legitimate policy in trying to sustain as many families as it could, even if by doing this it had to provide some of the larger families somewhat less than their ascertained per capita standard of need.

For other cases where welfare classifications have been upheld see Cheley v. Burson, 324 F.Supp. 678 (N.D.Ga.1971); Henry v. Betit, 323 F.Supp. 418 (D. Alaska 1971); Acosta v. Swank, 312 F. Supp. 765 (M.D.Ill.1970); Lewis v. Stark, 312 F.Supp. 197 (N.D.Cal.1968); Anderson v. Burson, 300 F.Supp. 401 (D.Ga.1968); Russo v. Shapiro, 309 F. Supp. 385 (D.Conn.1969).

Plaintiffs have attempted to distinguish *Dandridge, supra,* and similar cases saying that they do not involve a classification which is inherently suspect as is the case, they contend, with illegitimacy. Although the case they cite in support of this contention, Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), does not specifically mention illegitimacy as being an inherently suspect classification but does mention classifications based on alienage, race and nationality in this category, the Supreme Court in its recent opinion in Weber v. Aetna Casualty and Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), did imply that classifications based on legitimacy of birth were subject to stricter scrutiny than other equal protection cases.

█ Even though classifications based on illegitimacy are subject to strict scrutiny there can still be such classifications. Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971).

In *Weber, supra,* the court termed the inquiry in such cases to be a dual one: "What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger?" (406 U.S. at 173, 92 S.Ct. at 1405)

In *Weber, supra,* and two other relatively recent cases, Levy v. Louisiana,

391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) and Glona v. American Guarantee and Liability Insurance Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968), the Supreme Court found that the personal rights endangered by the challenged statutes far outweighed any possible state interest served by their continued vitality. In *Levy, supra,* the Court voided a Louisiana law denying actions for wrongful death of a parent to illegitimates while in *Glona, supra,* it held unconstitutional a law denying a wrongful death action to an unwed parent for the loss of his or her illegitimate child. The court found no rational relationship between the interest sought to be protected and the means used. As the court said in *Glona, supra*:

> ". . . we see no possible rational basis . . . for assuming that if the natural mother is allowed recovery for the wrongful death of her illegitimate· child, the cause of illegitimacy will be served. It would, indeed, be farfetched to assume that women have illegitimate children so that they can be compensated in damages for their death." 391 U.S. at 75, 88 S.Ct. at 1516.

In *Weber, supra,* the court, feeling that *Levy* was direct precedent for its decision, struck down a Louisiana statute which denied equal workmen's compensation recovery rights to dependent unacknowledged illegitimate children of workers who die on the job, stating that it cannot be thought that "persons will shun illicit relations because the offspring may not one day reap the benefits of workmen's compensation." 406 U.S. at 173, 92 S.Ct. at 1405.

The court in *Levy, Glona* and *Weber,* felt that since the statutes under review in those cases were unrelated to the accomplishment of any proposed state interest, the danger to fundamental personal rights far exceeded their usefulness. The court, however, never said that preventing illegitimacy was not a legitimate state concern. In *Weber,* Louisiana contended that it had a very important interest in protecting legiti-

mate family relationships. The court said "We do not question the importance of that interest; what we do question is how the challenged statute will promote it." 406 U.S. at 173, 92 S.Ct. at 1405. In Labine v. Vincent, *supra,* where the court upheld a Louisiana statute which allowed collateral relatives to take upon intestate succession to the exclusion of acknowledged but not legitimized children, it recognized the ability of the state, "to make rules to establish, protect, and strengthen family life . . . . " 401 U.S. at 538, 91 S.Ct. at 1021.

■ The Supreme Court has thus recognized the legitimate interest of a state to attempt to preserve and strengthen traditional family life. The Court's quarrel with the Louisiana statutes involved in *Levy, Glona* and *Weber* was with the lack of any relationship between the classifications they made and the interest sought to be advanced. In the case *sub judice,* New Jersey, through the eligibility requirements of the AFWP program, has apparently attempted to preserve and strengthen family life. The testimony in the case indicates both a compelling interest for the state to undertake such a task and a rational relationship between the method used and the end sought.

Doctor Leontine Young, a witness for the plaintiffs, and Executive Director of the Child Service Association in Newark, testified that all low income families, including therefore those receiving welfare assistance, have a high degree of unstable living relationships. This instability can lead to a state of normlessness or what sociologists call anomie, a breakdown of social control. Dr. Young admitted that a family structure based on ceremonial marriage could provide norms and prevent anomie.

Dr. Young's testimony is not surprising. Marriage, by itself, is a permanent, or at least semi-permanent institution. The state has reinforced it with a great deal of protection in its statutory and case laws. Its whole domestic relations law is designed to protect mar-

riage and the family and requires exacting procedures before a family can be broken by divorce. It all results from a recognition by the State of New Jersey and every other state in the United States that the family is the basic social unit, and provides much of the norms for a person's action in society. A living arrangement which does not have the aura of permanence that is concomitant with a ceremonial marriage, often does not provide the stability necessary for the instillment of those norms within the individual necessary for proper social behavior.

The AFWP subsidizes families. The State has determined that it only wants to subsidize what it considers to be legitimate families, ones where the likelihood is greater for the instillment of proper social norms. It is certainly both a proper and a compelling state interest to refuse to subsidize a living unit which may lead to the state of anomie and which violates its laws against fornication [4] and adultery.[5]

It is argued that the eligibility requirement of AFWP is not the wisest method of promoting family stability, is not the best way of achieving the State's goal. Dr. Young testified that loss of welfare income could break up those relationships where, although not sanctioned by law, some degree of permanence and stability has been maintained.[6] This may or may not be so. No proof was presented to this Court other than Dr. Young's expression of opinion, an opinion unsupported by reference to observed or collected data. We did hear

from Dr. John Dall, the Director of Office of Research and Evaluation for the State of New Jersey, who testified that he personally knows of fifty-one couples who were previously receiving assistance under the U and N Segments who have now become married and have thus become eligible to receive AFWP assistance. In any event, it is not for this Court to second-guess the Legislature as to the best method of accomplishing its purposes. We have neither the resources at our command to do so, nor that authority under law. See United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965). Our only concern is whether the method chosen is rationally related to the purpose. We think it is. Finding the interest and means appropriate, we must then see if fundamental rights are endangered, and if so, to what extent.

The plaintiffs repeatedly emphasize that the effect of the AFWP eligibility requirement is to punish an illegitimate child for a status upon which he had no control. In response to this argument it is first important to note that the classification here is not directed at illegitimate children but rather the whole living unit. In *Dandridge, supra,* the argument was made that Maryland's maximum grant regulation was a discrimination against new born children who had no control over their birth. The Court, however, focused upon the family as a unit and said that it was the subject of the regulation, not the individual child, and thus any endangering of the rights of the child was less of an issue. Here

---

4. N.J.S. 2A:110–1.

5. N.J.S. 2A:88–1.
   In King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), the Supreme Court held that under Federal Law a state participating in the AFDC Program could not, in budgeting the amount of aid a family was to receive, consider the earnings of a man who may have had sexual relations with the mother of the dependent children but who did not have an obligation to support those children. The Court said that a state cannot deny aid under the AFDC

Program as a means to discourage immorality and illegitimacy. However, the court made its ruling based on state participation in a Federal Program and on the Statutory Requirements for such participation. It never reached any Constitutional issues, so that case does not prevent New Jersey from using its wholly state financed AFWP to discourage immorality and illegitimacy.

6. Such people would still be eligible for general welfare assistance pursuant to N.J.S. 44:8A.

**498**

too the law is directed at the living unit rather than the child. Secondly, in *Labine, supra*, and *Weber, supra*, the court put great import upon whether the barrier to the illegitimate child was or was not insurmountable. In *Labine* the Court did not find such impediment. The child's status under intestacy laws could be altered by use of a will. In *Weber*, on the other hand, alteration of the child's disfavored status under Louisiana's Workmen's Compensation Law was impossible. "The burdens of illegitimacy, already weighty, become doubly so when neither parent nor child can legally lighten them." We find no such impossibility here. The parents can get married or the child can be adopted and the family will then be eligible for AFWP assistance. Any disadvantage to the illegitimate child can thus be overcome. In fact, the State, through use of its AFWP money, provides an incentive for overcoming any disability associated with illegitimacy. The danger to personal rights posed by the AFWP program is therefore minimal.

As we find that the tests posed by the Supreme Court in Weber have been met, we must therefore reject plaintiffs' contentions under Count 7.

## II

■ Count 10, which is related to Count 7 and will thus be considered out of numerical order, charges that the AFWP eligibility requirement that both parents be in the home, be ceremonially married to each other, and be the natural or adoptive parents of children in the home, constitutes *de facto*, if not *de jure*, discrimination against Blacks since they are more likely to be unable to meet these requirements than Whites.

In an effort to prove that the AFWP requirements have a greater adverse impact on Blacks than any other group, the plaintiffs produced four witnesses: John Wilson, a Black, and a former aid recipient under the U and N Segments, but ineligible under AFWP; Ilise Newman, a caseworker for the Essex County Welfare Board; Dr. Leontine Young,

the Director of Child Service Association of Newark; and Doctor Bernice Boehm, a Professor at the Rutgers Graduate School in Social Work.

John Wilson, whom the Court allowed to be added as a plaintiff in this action, testified that he is presently living with a woman, Claudia Thompson, not his wife, by whom he has eleven children. They have been living together since 1958 and had received welfare assistance under the old U and N Segments but were held ineligible under the AFWP because of their inability to be ceremonially married. He testified that he could not marry Miss Thompson, although he would like to, because he was married in 1940 to another woman in Miami, Florida, and has never been divorced. She deserted him in 1954 and he has only seen her once since. He went to Legal Services in 1971 to seek their assistance in obtaining a divorce, but when he was unable to locate his wife he did not follow through with the divorce action. Miss Newman corroborated his story.

Dr. Young and Dr. Boehm, relying on their long experience in the field of social work, said that they were of the opinion that Black marriages were more unstable than White, that Blacks out of a wariness of the legal system and lack of money were more unlikely to seek divorce than Whites, that there was more illegitimacy amongst Blacks than Whites, and that adoption was more difficult for Black babies than White. Only as to the latter two facts were they able to present any hard statistics in support of their contentions. As for illegitimacy, 5.3% of all White births are illegitimate whereas 31.2% of all Black births are out of wedlock. As for adoption, for every 100 White children available there are 110 applicants, whereas for every 100 Black children available there are only 48 or 49 applicants.

The plaintiffs present these opinions and statistics to show that even if the Legislature did not intend to discriminate against Blacks, the AFWP has a much greater adverse impact on Blacks

than Whites and as such was *de facto* discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

In furtherance of this contention, plaintiffs rely on such cases as Hobson v. Hansen, 269 F.Supp. 401 (D.C.1967) aff'd sub nom; Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969); Barksdale v. Springfield School Committee, 237 F.Supp. 543 (D.Mass.1965); Reitman v. Mulkey, 387 U.S. 369, 87 S. Ct. 1627, 18 L.Ed.2d 830 (1971); Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) and Wright v. Brighton, 441 F.2d 447 (5th Cir. 1971). These cases all involve laws which are neutral on their face but in reality worked adversely to the Black population. In some of the cases, such as *Hunter, supra*, the laws were really designed to foster discrimination. There the Supreme Court invalidated an amendment to a city charter which in effect withdrew all existing fair housing ordinances and further required a public referendum to enact any future fair housing laws. Others involved the invalidation of policies which, although neutral on their face, worked discriminatorily against Blacks. This includes the neighborhood school policy invalidated as *de facto* discrimination in *Barksdale, supra*.

However, none of these cases directly apply to the situation *sub judice*. Even if the AFWP eligibility requirement does work more heavily against Blacks than Whites the State is justified in making these requirements. It does not want to subsidize an illicit living unit. It does not want to subsidize violations of its laws against fornication and adultery. To say that this policy is racially discriminatory against Blacks because they are more likely to be involved in more of these illicit living units than Whites, is to say that the laws against adultery and fornication are racially discriminatory for the same reason. Carried to an extreme it would be possible to say that the Legislature, by making anything a crime which may be done more by Blacks than by Whites, would be discriminating against Blacks.

In any event, plaintiffs failed to meet their burden of proving that the AFWP eligibility requirement is more severe against Blacks than Whites. See Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). All they were able to show was a higher illegitimacy rate and lower adoption rate amongst Blacks than Whites. They were not able to prove anything directly relating to the actual effect of the requirement. Only the State was able to do that. Dr. John Dall, Director of the Office for Research and Evaluation for the State of New Jersey, prepared a computer run which analyzed the actual racial make-up of those who had previously been recipients of aid under the U and N Segments who were no longer eligible for AFWP assistance. This analysis established that of the 981 people who were no longer receiving aid, 312, or 31.7% were Black. This compares to the overall percentage of Blacks who were in the U and N Segment programs which was 35%. Thus in the program change Whites were slightly more adversely affected than Blacks.[7]

We cannot therefore find any discrimination *de jure* or *de facto* as a result of the eligibility requirement of the AFWP.

### III

Count 8 is unrelated to the eligibility requirements for the AFWP. Instead,

---

7. These statistics may not be absolutely correct, since Professor Dall testified that he could not separate those who were now ineligible for AFWP assistance because of earning too much money from those ineligible because of their living relationships. However, they are at least indicative of the lack of excessive differences in the effect of the AFWP on Blacks as opposed to Whites.

it is concerned with specifics of the Program's operation.

When an applicant applies for AFWP assistance, that family's needs are figured according to family size, ages, etc. From that figure is subtracted the family's adjusted gross income, which is defined as the gross income of all employed individuals within the family less the first $60.00 earned by each such member, disregarding the income of a minor child under sixteen or under eighteen if he or she is attending school on a full time basis. The plaintiffs contend that the $60.00 may not be enough to take into account withholding taxes, social security taxes, court-ordered support payments etc., and, if not, that family will not receive enough assistance to meet its need. By the State assuming that it will be enough, say the plaintiffs, it is creating an irrebuttable presumption in violation of the Due Process Clause of the Fourteenth Amendment.

The plaintiffs rely on cases such as Heiner v. Donnan, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1931); Schlesinger v. Wisconsin, 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557 (1926); Hoeper v. Tax Commission, 284 U.S. 206, 52 S.Ct. 120, 76 L.Ed. 248 (1931); and Wieman v. Updegraff, 344 U.S. 183, 188, 73 S.Ct. 215, 97 L.Ed. 216 (1952), which are cases saying that the government cannot constitutionally take away tax money or public employment by means of conclusive presumptions. Quoting from their brief, the plaintiffs' argument is: "If the government cannot constitutionally take away tax money or public employment by means of conclusive presumptions, then, a fortiori, it cannot by the same means take from needy children the bare subsistence provided by AFWP".[8]

■■ This argument must fail for a number of reasons. First, there is a difference between a taking situation, such as taxes or loss of public employment, and a giving situation, such as welfare. This might be different if there was a Constitutional right to welfare, which there is not, Rothstein v. Wyman, 303 F.Supp. 339, 346 (S.D.N.Y. 1961), and even if so, there would also have to be a Constitutional right that the state grants full minimum needs to each recipient. This is not true even where the state is participating in federally funded programs. Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). In Rosado, supra, the court said that there was no requirement, even under statutory law, that the states had to even attempt to make grants equalling 100% of need. Thus even if the claimed expenses did equal more than $60.00 and the minimum needs of a recipient was therefore not met, no constitutional requirement would be violated.

Secondly, if the $60.00 income disregard was to be considered an irrebuttable presumption in violation of due process, then any averaged budget figure could be so considered. For example, if a budget manual called for giving a family of four $100 per month for food, some families of that size may not be able to eat on that amount, so that could be called an irrebuttable presumption in violation of due process of law. However, the court in Rosado, supra, specifically sanctioned the process of averaging even though "such averaging may affect some families adversely and benefit others". 397 U.S. at 419, 90 S.Ct. at 1221.

In Amos v. Engelman, 333 F.Supp. 1109 (D.N.J.1970), (Three Judge Court) aff'd 404 U.S. 23, 91 S.Ct. 181, 30 L.Ed. 2d 143 (1971) one of the claims made against the welfare statute there under attack was that the State, as a participant in a federal program, was required by Federal law to allow AFDC families to deduct from income "any expenses reasonably attributable to the earning of any such income".[9] New Jersey allowed a flat $50.00 as an employment expense deduction, which was attacked as being unreasonable, since some families had

---

8. Plaintiffs' Brief p. 90.

9. 42 U.S.C. § 602(a)(8).

larger employment expenses. The Court held that it was reasonable under the statute and that *Rosado, supra,* allowed averaging. Ability to average applied both to components of need and employment expenses. It also would seem to apply to deductions from gross income, if there was such a statutory requirement here. But, as the AFWP is totally state financed, there is not even that consideration.

In *Amos, supra,* the court never even considered the flat deduction from a constitutional standpoint, presumably because no substantial constitutional question was presented. Count 8 therefore similarly raises no constitutional question of merit.

In rejecting Counts 7, 8 and 10 the Court makes no judgment as to the advisability of all parts of N.J.S. 44:13–1 nor do we say that improvements could not be made in the classifications under that Act. As the Supreme Court said in *Dandridge, supra,* as re-emphasized in *Jefferson, supra:*

> "We do not decide today that the (state law) is wise, that it best fulfills the relevant social and economic objectives that (the state) might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court . . . (T)he Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." 397 U.S. at 487, 90 S.Ct. at 1162, 25 L.Ed.2d 491

An Order will be submitted by the defendants in conformity with this Opinion.