Ella METCALF, Individually and on behalf of her minor children, Amelia Dukes, Annie Mae Jones, Individually and on behalf of her minor children, Flora Ellis, Individually and on behalf of her minor children, and Margeree Brown, Plaintiffs,

v.

James L. TRAINOR, Director, Illinois Department of Public Aid, and William H. Robinson, Director, Cook County Department of Public Aid, Defendants (two cases).

Mary K. GUNLOGSON, Individually and on behalf of her minor children, Earl and Rochelle Robinson, Individually and on behalf of their minor children, and Judith Coleman, Individually and on behalf of her minor child, Plaintiffs,

v.

George APOSTALOS, Individually and as superintendent, DuPage County Department of Public Aid, David Daniel, Individually and as director, Cook County Department of Public Aid, Valleywood Apartments, an Illinois corporation, and Wayne Shimp, Individually and as sheriff of DuPage County, Illinois, Defendants (two cases).

Nos. 68 C 1226, 73 C 1603.

United States District Court,
N. D. Illinois, E. D.

May 7, 1979.

Robert Bennett, Wendy Meltzer, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs.

William A. Wenzel, III, Sp. Asst. Atty. Gen., Chief, Welfare Litigation, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

ROBSON, Senior District Judge.

This cause is before the court on the crossmotions of plaintiffs and defendants in these consolidated actions for summary judgment. For the reasons hereinafter stated, the motion of the plaintiffs is granted in part and denied in part, and the motion of the defendants is granted in part and denied in part.

Plaintiffs invoke the jurisdiction of this court pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4). Defendants dispute jurisdiction claiming that the complaints fail to state a substantial federal question under 42 U.S.C. § 1983 for purposes of 28 U.S.C. § 1343(3) and (4). Plaintiffs and defendants have filed crossmotions for summary judgment on issues of liability in regard to defendants' administration of the shelter exception program for public aid recipients.

### I. BACKGROUND

█ The pending actions are consolidated cases brought by recipients of Aid to Families with Dependent Children [hereinafter AFDC][1] and of the State Supplemental

---

1. The plaintiff recipients of AFDC are Ella Metcalf on behalf of herself and her five minor children; Annie Mae Jones on behalf of herself and her seven minor children; Flora Ellis and her five minor children; Mary K. Gunlogson and her minor children; Rochelle Robinson and her minor children; and Judith Coleman and her minor child.

Several of the AFDC plaintiffs must be dismissed as party plaintiffs because they no long-er have a case or controversy with the defendants. Annie Mae Jones and her seven minor children must be dismissed, because subsequent to the initiation of this suit in October, 1968, Jones and her children received the requested relief in the form of an excess rent grant as part of their AFDC grant. In addition, Jones is no longer a viable plaintiff because plaintiffs' attorneys have not been in contact with her and are unable to determine her

Program [hereinafter SSP] to the federal Supplemental Security Income [hereinafter SSI].[2] Defendants are the directors of the Illinois, Cook County, and DuPage County Departments of Public Aid[3] charged by law with the enforcement of the Illinois Public Aid Code. Ill.Rev.Stat. ch. 23, §§ 12–1 and 12–2.

Plaintiffs in *Metcalf v. Swank,* 68 C 1226, brought a class action suit in 1968 challenging the constitutionality of Ill.Rev.Stat. ch. 23, § 12–4.11[4] and § 12–14[5] imposing a

whereabouts. Flora Ellis and her five minor children are equally nonviable plaintiffs because plaintiffs' attorneys have not been in contact with Ellis and have been unable to ascertain her whereabouts since September, 1968. *See Metcalf v. Swank,* 305 F.Supp. 785, 787 n.2 (N.D.Ill.1969), *aff'd,* 444 F.2d 1353 (7th Cir. 1971), *vacated and remanded on other grounds,* 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 1113 (1972).

2. The plaintiff recipient of SSP is Margeree Brown. Plaintiff Amelia Dukes received benefits under a program of Aid to the Aged, Blind and Disabled, a forerunner program to the present SSI. Dukes must be dismissed as a party plaintiff, because she stopped receiving benefits from the Illinois Department of Public Aid in June, 1970, when she moved to Omaha, Nebraska, and because she subsequently died on October 18, 1973.

3. Defendants involved in the crossmotions for summary judgment are James L. Trainor, the Director of the Illinois Department of Public Aid; William H. Robinson and David Daniel, previous Directors of the Cook County Department of Public Aid; and George Apostalos, the Superintendent of the DuPage County Department of Public Aid. The plaintiffs are directed to substitute the present representative parties if different from those presently named. Defendants Valleywood Apartments and Wayne Shimp, the sheriff of DuPage County, are not parties to the crossmotions.

4. Ill.Rev.Stat. ch. 23, § 12–4.11 provides, in relevant part:

The standards shall provide a livelihood compatible with health and well-being for persons eligible for financial aid under any Article of this Code. . . .

. . . . .

In establishing a standard for shelter, the Department shall take in account in each community the prevailing rates or costs for housing of low income persons and the factors which influence the level of such rates or charges. However, the shelter standard for any recipient, exclusive of household furnishings and utilities, shall not exceed $97 per month, except for adjustments made in the manner authorized by Section 12–14. If recipients can obtain adequate shelter only if a security deposit is given the landlord, the Department may furnish one month's rent as a security deposit. This provision shall be operative only to the extent that Federal participation in program costs is not adversely affected by such programs, and does not foster the granting of duplicative assistance.

. . . . .

Nothing contained in this Section or in any other Section of this Code shall be construed to prohibit the Illinois Department (1) from consolidating existing standards on the basis of any standards which are or were in effect on, or subsequent to July 1, 1969, or (2) from employing any such consolidated standards in determining need for public aid and the amount of money payment or grant for individual recipients or recipient families.

In establishing standards under this Section the Illinois Department shall consult with the Legislative Advisory Committee, as provided in Section 12–14.

The Shelter maximum was increased from $90 per month to $97 per month effective August 27, 1970.

5. Ill.Rev.Stat. ch. 23, § 12–14 provides, in relevant part:

A legislative Advisory Committee on Public Aid, composed of 6 members of the House of Representatives appointed by the Speaker thereof and 6 members of the Senate appointed by the President thereof, shall exercise the powers and duties herein prescribed relevant to the policies and administration of the public aid programs established by this Code.

. . . . .

When limitations are imposed by this Code or by any other law on grants to recipients of public aid, the Illinois Department may authorize deviations from such limitations only after prior notice to and consultation with the Committee. If two-thirds of the membership of the Committee determine as a matter of policy that deviations from such limitations should or should not be made, the Illinois Department shall give substantial consideration to such determination.

. . . . .

The Committee shall exercise its powers and duties only in accord with federal law and regulations governing grants to this State for public aid purposes. Any such power or duty which may be in conflict with any such federal law or regulations shall be inoperative.

582

maximum shelter allowance of $90 per month for all those on public assistance. Plaintiffs sought prospective injunctive and declaratory relief, as well as the retroactive payment of wrongfully withheld benefits. On November 12, 1968, a three-judge court granted defendants' motion to dismiss count I of the complaint, a challenge to the facial constitutionality of the shelter maximum. Because exceptions were authorized to be provided by the Illinois Department of Public Aid [hereinafter IDPA], after consultation with a legislative advisory committee, the statute withstood a facial constitutional attack. *Metcalf v. Swank,* 293 F.Supp. 268, 270 (N.D.Ill.1968). The standard of § 12–4.11 to "provide a livelihood compatible with health and well-being for persons eligible for financial aid" was "to be the guideline for the Illinois Department of Public Aid to follow in granting exceptions." *Id.* The remaining factual claims, including the constitutional allegations of counts II and III that the shelter exception program was "void as applied," were remanded to a single judge. *Id.* at 269 n. 1, 270.

Plaintiffs filed an amended complaint on November 21, 1968. On October 29, 1969, the court dismissed the amended complaint for failure to exhaust administrative remedies and for failure to state a substantial constitutional claim absent the exhaustion of state administrative remedies. *Metcalf v. Swank,* 305 F.Supp. 785, 788 (N.D.Ill. 1969). On April 30, 1971, the Seventh Circuit Court of Appeals affirmed the dismissal. 444 F.2d 1353 (7th Cir. 1971). The

Seventh Circuit denied a rehearing *en banc* on July 1, 1971. On May 15, 1972, the United States Supreme Court reversed the dismissal and "remanded for further consideration in light of *Carter v. Stanton,* 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972)," an intervening decision.[6] 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 113 (1972). On March 16, 1973, the Seventh Circuit remanded counts II and III to the district court for decision finding that plaintiffs' complaint contained allegations "which if proven, contain elements both of constitutional and statutory violation."

On June 20, 1973, *Gunlogson v. Apostalos,* 73 C 1603, was filed in federal district court. Because count I of *Gunlogson v. Apostalos*[7] and counts II and III of the first amended complaint of *Metcalf v. Edelman*[8] were substantially identical, the court entered an order on June 26, 1974, consolidating these two cases. On June 26, 1974, the court denied defendants' motion to dismiss the complaints in the consolidated cases. Nonetheless, based on the Supreme Court decision in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the court ruled that it was without jurisdiction under the eleventh amendment to grant plaintiffs retroactive benefits.

On October 2, 1974, plaintiffs' motion to certify the cases as class actions was denied. *Metcalf v. Edelman,* 64 F.R.D. 407 (N.D.Ill. 1974).[9] The court characterized the remaining count of plaintiffs' consolidated complaint as an allegation that defendants did not provide plaintiffs with a livelihood compatible with health and well-being as re-

6. The Court in *Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972), held that exhaustion of state administrative remedies is not required in a federal constitutional and statutory challenge to a state welfare regulation.

7. On October 10, 1974, plaintiffs' motion to dismiss counts II and III of the complaint in *Gunlogson v. Apostalos* was granted.

8. On October 2, 1974, James L. Trainor, in his official capacity as acting director of the IDPA, was substituted as party defendant for Joel Edelman, pursuant to Fed.R.Civ.P. 25.

9. The official policy in granting exceptions to the shelter maximum was to consider each request on its own merits rather than on a general basis. Exhibit 99. The individualized consideration necessary to determine whether an excess rent grant should be approved militated against a class action determination. This is especially so because determination of class relief based on the particularized standard of providing exceptions to the shelter maximum consistent with "health and well-being" would involve a subjective interpretation of fairness by a court lacking any expertise in the field of public assistance. *New Jersey Welfare Rights Organization v. Cahill,* 349 F.Supp. 501, 510 (D.N.J.1972),*aff'd,* 483 F.2d 723 (3d Cir. 1973).

quired by statute by refusing to furnish plaintiffs with exceptions to the $97 shelter maximum. *Id.* at 408. The alleged abuses of the exception system were in the arbitrary and capricious manner of administration in violation of statutory and constitutional standards. *Id.* at 409. Although the grant of exceptions has been eliminated by the consolidation of the individual component parts of AFDC grants into a single consolidated grant of public aid to a recipient, plaintiffs continue to allege that the new plan merely perpetuates the effect of the alleged abuses of the exception system.

Illinois adopted a Consolidated Standard Plan [hereinafter CSP] on October 1, 1973, for its AFDC program. *See* Exhibit 16; *Illinois Welfare Rights Organization v. Trainor,* 438 F.Supp. 269, 274 (N.D.Ill.1977) [hereinafter *IWRO v. Trainor*]. The CSP altered the method of computing the budgeted need for an AFDC family. Prior to the CSP, AFDC grants were computed by the adding together of monetary allowances for approximately seventy items of need like rent, clothing, laundry, transportation, child care, etc., that a particular AFDC recipient required. In the CSP each item of need was "averaged" over the entire AFDC caseload. The individualized determination of an AFDC grant was changed to a flat grant with payments varying only by family size, shelter zone, and type of family (*i. e.,* adult AFDC recipient or nonadult-only children receiving AFDC and the adult caretaker receiving income from another source). The effect of the CSP was to reduce grants to those families whose prior budgeted need was above the new flat grant and to increase grants to those families whose prior budgeted need was lower than the flat grant.

Plaintiffs and defendants filed crossmotions for summary judgment on October 12, 1976, on the issue of liability. Plaintiffs filed a memorandum in support of their motion for summary judgment on January 24, 1977. Defendants filed a motion for summary judgment and memorandum in support and in opposition to plaintiffs' motion on May 9, 1977. On May 27, 1977, plaintiffs filed a reply memorandum in support of their motion for summary judgment and in opposition to defendants' motion. A final pretrial order was filed on July 16, 1977. Neither party raises or relies upon contested issues of fact in their crossmotions for summary judgment.[10]

## II. STATEMENT OF THE ISSUES AND DECISION

### A. Statement of the Issues

Because the pleadings do not fully state the present controversy after the implementation of the CSP, the parties filed a memorandum of issues to be decided on the motions for summary judgment.[11]

Plaintiffs present the following issues:

1. Whether defendants' administration of the Aid to Families with Dependent Children [hereinafter AFDC] program with respect to excess rent grants, prior to October 1, 1973, violated the Social Security Act, 42 U.S.C. § 606(a), the Code of Federal Regulations, 45 C.F.R. § 233.20(a), the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution, and the Illinois Public Aid Code, Ill.Rev.Stat. ch. 23, § 12–4.11.

2. Whether, by virtue of previous illegality, the AFDC Consolidated Standard Plan instituted by defendants on October 1, 1973, violates the Social Security Act, 42 U.S.C. § 602(a)(23), the Code of Federal Regulations, 45 C.F.C. § 233.20, and the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution.

10. Contested issues of fact may exist on damages issues which are not the subject of the crossmotions for summary judgment.

11. The court has not required an amendment of plaintiffs' complaint so as to avoid delay in these protracted proceedings despite the changed circumstances in the administration of the AFDC grant. Thus, the court directed the parties to file a memorandum of the issues to set forth the contested issues as they presently exist.

3. Whether defendants' present administration of excess rent grants in the State Supplemental Program [hereinafter SSP] of assistance to aged, blind and disabled persons violates the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution.

Defendants present the following issues.

1. Whether the denial of an excess rent grant under the AFDC program prior to October 1, 1973, to Ella Metcalf and the other named plaintiffs violated the due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution, or the Illinois Public Aid Code, Ill.Rev.Stat. ch. 23, § 12–4.11.

2. Whether the manner in which defendants applied and administered the shelter allowance provisions of the Illinois Public Aid Code, Ill.Rev. Stat. ch. 23, §§ 12–4.11, 12–14, to deny an excess rent grant to Ella Metcalf and the other named plaintiffs deprive them of their rights guaranteed by the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution.

3. Whether the denial of an excess rent grant to Margeree Brown in the SSP program violated the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution, or the Illinois Public Aid Code, Ill.Rev.Stat. ch. 23, § 12–4.11.

4. Whether the complaint states a substantial federal question for purposes of federal jurisdiction.

## B. Statement of Decision

The court finds that the consolidated complaint raises substantial federal questions providing sufficient grounds for the assertion of federal jurisdiction.

As to the administration of the excess rent grant program prior to October 1, 1973:

1. Plaintiffs have no case or controversy concerning consideration of the food stamp bonus as income in the excess rent grant determination.

2. The IDPA improperly considered the earned income exemption, 42 U.S.C. § 602(a)(8), in the excess rent grant determination. No claim is presented against the Cook County Department of Public Aid [hereinafter CCDPA].

3. The IDPA and the CCDPA properly granted excess rent grants only for "standard housing."

4. The quota set by defendants on the number of excess rent grants was contrary to 42 U.S.C. § 602(a)(10) and 45 C.F.R. § 233.20. This determination makes consideration of the equal protection challenge unnecessary.

5. The administration of the excess rent grant program denied some eligible AFDC recipients excess rent grants, which they were entitled to receive pursuant to 42 U.S.C. § 602(a)(10) and Ill.Rev.Stat. ch. 23, § 12–4.11. This determination makes consideration of the due process challenge unnecessary.

As to the Illinois CSP of October 1, 1973:

1. The decision in *IWRO v. Trainor, supra*, determined that the IDPA properly incorporated the budgeted amount for shelter rather than the actual cost for shelter in the CSP.

2. The IDPA was not required to conduct a survey of shelter needs of AFDC recipients to determine the standard of need for shelter for purposes of the CSP.

As to the administration of the SSP program, because the previous policy upon which the action is based has been superseded, plaintiffs' claims are moot.

## III. JURISDICTION

In their memorandum of issues, defendants question whether plaintiffs' consolidated complaint raised a substantial federal question for purposes of federal juris-

diction. Although defendants did not discuss this issue in their memorandum in support of summary judgment, their position appears to be premised on the failure of plaintiffs to file an amended complaint after the adoption of the CSP and the termination of all excess rent grants. As stated in note 11, *supra*, the court did not require plaintiffs to file an amended complaint. Because all parties were aware that after the adoption of the CSP in 1973 plaintiffs' substantive allegations concerning the administration of excess rent grants persisted due to the perpetuation of the alleged illegalities in the CSP, the complaint did not require amendment.

On March 16, 1973, the Seventh Circuit Court of Appeals remanded *Metcalf v. Trainor* to this court and stated that plaintiffs' complaint contained allegations "which if proven, contain elements both of constitutional and statutory violation." On June 26, 1974, this court in a memorandum opinion in *Gunlogson v. Apostalos* at 14–16, equally applicable to *Metcalf v. Trainor*, stated that because plaintiffs had pleaded a colorable constitutional claim pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1343(3) provides federal jurisdiction. Thus, defendants' jurisdictional arguments were rejected by this court and the seventh circuit at an earlier point in these proceedings.

■ In particular, the court finds that plaintiffs' allegations concerning the denial of excess rent grants to them without the application of any standards and contrary to their property right under the Illinois statutory standard for excess rent grants raise a substantial due process claim. In addition, plaintiff Metcalf raises a substantial equal protection claim as to the alleged invidious discrimination of the quota system used in the administration of the excess rent grant program. *Dandridge v. Williams*, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Because substantial federal constitutional claims are present, the court has jurisdiction over the federal constitutional claims. *Hagans v. Lavine*, 415 U.S. 528, 538, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Because this court has jurisdiction over the federal constitutional claims, the court also has jurisdiction over the federal statutory claims pursuant to 42 U.S.C. § 1983 and over the state statutory claims pursuant to the court's pendent jurisdiction. *Id.* at 536, 543, 94 S.Ct. 1372. Defendants' motion for summary judgment on the ground that this court lacks jurisdiction is denied.

## IV. CLAIMS INVOLVING AFDC

### A. The Structure of AFDC

■ Title IV of the Social Security Act, 42 U.S.C. § 601 *et seq.*, provides for financial assistance and ancillary benefits through the AFDC program to "needy dependent children and the parents or relatives with whom they are living." 42 U.S.C. § 601. The state of Illinois has elected to participate in the AFDC program at all relevant times and is thus bound by terms and conditions set by federal statutory and regulatory requirements for the disbursal of funds. *King v. Smith*, 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). IDPA is the state agency which administers public assistance programs including the AFDC program throughout the state. The CCDPA administers the AFDC program in Cook County, and the DuPage County Department of Public Aid [hereinafter DCDPA] administers the AFDC program in DuPage County. The CCDPA has been an agency of the IDPA since January, 1974, and the DCDPA has been an agency of the IDPA at all relevant times.

■ States are not free to narrow the federal standards that define the categories of people eligible for aid. Assistance is to be made available to all who meet AFDC eligibility criteria as set forth in 42 U.S.C. § 602(a) and implementing federal regulations. *Quern v. Mandley*, 436 U.S. 725, 740, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978). Nonetheless, a state retains the ability to control its total AFDC expenditures by setting its own monetary standard of need and the level of benefits to be paid to AFDC recipi-

ents.[12] *Id.* at 740 n. 17, 98 S.Ct. 2068; *King v. Smith, supra,* 392 U.S. at 334, 88 S.Ct. 2128.

■ The items of need taken into account by a state in its standard of need can vary. In addition, the level of benefits can vary depending upon the amount of aid a state wants to provide AFDC recipients. *Rosado v. Wyman,* 397 U.S. 397, 408, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Illinois includes the item of shelter in the calculation of its standard of need. Illinois provides benefits for 100 percent of its calculated standard of need for AFDC recipients. Stip. 104. The preconsolidation standard of need for shelter was not the actual cost of shelter to an AFDC recipient but was equal to the amount of shelter which would "provide a livelihood compatible with health and well-being for persons eligible for financial aid," Ill.Rev.Stat. ch. 23, § 12–4.11. *IWRO v. Trainor, supra* at 275.

The IDPA took this standard of need to be the amount it budgeted for shelter and incorporated the averaged figure into the CSP. The allowance for shelter[13] was budgeted and paid as incurred up to a fixed maximum of $97 established by Ill.Rev.Stat. ch. 23, § 12–4.11. Excess rent grants were available to "provide a livelihood compatible with health and well-being" in numbers established by a Legislative Advisory Committee formed pursuant to Ill.Rev.Stat. ch. 23, § 12–14. The number of excess rent grants authorized by the Legislative Advisory Committee increased from 225 in August, 1966, to 3,975 in March, 1973.

With the CSP, AFDC families were no longer eligible to receive new excess rent grants. Those receiving excess rent grants at the time of the implementation of the CSP were permitted to continue to receive the grants as long as they resided in the same house or apartment as they did on September 30, 1973. As of November 21, 1976, the IDPA discontinued the remaining excess rent grants because the Department of Health, Education and Welfare determined that the IDPA was out of compliance with federal standards by providing exceptions to some recipients and not providing exceptions to others in the same circumstances. Exhibit 105.

### B. Effect of IWRO v. Trainor

The decision by the district court in *IWRO v. Trainor, supra,* determined some of the issues raised by plaintiffs particularly in regard to the Illinois CSP. Plaintiffs argued in *IWRO v. Trainor, supra* at 275, as they do here, "that the IDPA incorrectly included in its CSP the amount that *it had paid* to AFDC recipients and that instead IDPA should have included the *amount paid by the AFDC recipients* for their actual shelter." The plaintiffs thus assert that the IDPA illegally lowered its 1969 standard of need for shelter by the incorporation process of the CSP.

■ In analyzing whether the guidelines of 42 U.S.C. § 602(a)(23) were violated by the consolidation, the court compared the standard of need before and after the consolidation. *Id.* at 273. The court held that the requirements of 42 U.S.C.

12. "The standard of need is a dollar figure set by each state reflecting the amount deemed necessary to provide for essential needs, such as food, clothing and shelter. *See Rosado v. Wyman,* 397 U.S. 397, 408, 90 S.Ct. 1207, 25 L.Ed.2d 442. It is the 'yardstick' for measuring financial eligibility for assistance, but the level of benefits actually paid is not necessarily a function of the standard of need. *Ibid.*" *Quern v. Mandley, supra* at 737, 98 S.Ct. at 2075.

13. The parties stipulated to the following in their pretrial order:
For the purpose of these stipulations, "rent" paid by a tenant is the amount paid each month to a landlord. "Rent" may or may not

include payment to the landlord for utilities. A "shelter allowance" paid by the Department of Public Aid is the amount allotted by the Department to a recipient to defray the cost only of shelter. The "shelter allowance" does not include separate allowances to defray utility costs, even though "rent" paid by the recipient tenant may include payment for utilities.

These terms are used in this memorandum and order as stipulated to by the parties. "Shelter exception" and "excess rent grant" are used interchangeably to identify the allottment by the IDPA for shelter only over the shelter maximum.

§ 602(a)(23) were complied with when the IDPA incorporated the prior shelter item standard into the CSP. First, the court held that actual cost of shelter was not the standard of need prior to the CSP. *Id.* at 275. Second, the court held that by averaging the amounts actually budgeted to AFDC recipients for shelter, "Illinois did not price its shelter standards so low so as to eliminate it from its standard of need for AFDC recipients." *Id.* at 277. Thus, plaintiffs' argument that the CSP improperly incorporated the budgeted amount for shelter is precluded and lacks merit.

### C. Mootness and the AFDC Plaintiffs

As an initial consideration, defendants contend that the administration of the shelter exception program prior to the CSP and the entitlement of the named plaintiffs to present excess rent grants are moot issues. Because the complaint has never been amended to consider issues raised by the CSP and because excess rent grants have been discontinued, defendants claim that plaintiffs' claims for excess rent grants are moot.

■ In a memorandum and order of June 26, 1974, in *Gunlogson v. Apostalos,* at 6, the court held that the decision of *Edelman v. Jordan, supra,* 415 U.S. at 677, 94 S.Ct. 1347, meant that insofar as relief sought by plaintiffs amounts to an award of retroactive benefits, federal courts are without jurisdiction under the eleventh amendment to grant this relief. Thus, past benefits that may be due to the plaintiffs for failure to grant them rent exceptions cannot be recovered, while the court has the power to grant prospective injunctive relief.

■ In suits for injunctive relief, the test for mootness is whether the alleged injury is continuing or likely to be repeated. *Southwestern Bell Telephone Co. v. Communications Workers of America,* 454 F.2d 1333, 1334 (5th Cir. 1971). Excess rent grants were properly terminated by the IDPA pursuant to instructions from the Department of Health, Education and Welfare. Exhibit 105. In addition, the court seriously doubts that Illinois will reinstate an individualized grant program now that the CSP has been in operation for five years. Because the excess rent grants are not continuing or likely to be repeated, plaintiffs' claims to excess rent grants are moot. *See Cornelius v. Minter,* 395 F.Supp. 616, 622 (D.Mass.1974). Nonetheless, plaintiffs' AFDC claims are not moot because their alleged injury is continuing.

■ States may not mask a prior violation of law by an updated consolidation. 42 U.S.C. § 602(a)(23); *IWRO v. Trainor, supra* at 279. The lawfulness of the preconsolidation policy is still a crucial issue because the present consolidated system for fixing the standard of need for shelter is based on an averaging of the benefits paid when the shelter exception policy was in effect. If the application of the shelter exception policy unlawfully reduced the standard of need for the individual plaintiffs, the policy also reduced the averages from which current benefits were computed thereby obscuring the actual standard of need. Brief of United States of America as amicus curiae, at 9, *Chapman v. Houston Welfare Rights Organization,* 77–719, before the United States Supreme Court. Thus, because of the alleged perpetuation of illegalities in the CSP, plaintiffs have a continuing cause of action after the implementation of the CSP and the termination of the shelter exception policy.

■ Because the claimed illegalities in the shelter exception policy are relevant only insofar as the illegalities were perpetuated in the CSP, the court will only consider the claims of those plaintiffs who sought but did not receive a shelter exception for the statistical time period used by the IDPA in computing the shelter figure used in the consolidation. IDPA calculated the rent component of the CSP by averaging for each size family the actual grants made by IDPA to AFDC recipients for rent in January, February, and March of 1973. Thus, only those AFDC plaintiffs who were not receiving excess rent grants applied for prior to or during January, February, or March of 1973, remain in this action. These

plaintiffs are Ella Metcalf, Mary Gunlogson, Earl and Rochelle Robinson, and Judith Coleman.[14]

The remaining AFDC issues concern the actual operation and administration of the excess rent grant program. As to each of these issues, the court will first determine whether plaintiffs have a case or controversy with defendants. As to those issues where a case or controversy is present, the court will then determine whether defendants' actions violated the federal constitution, federal statutes or regulations, and state statutes.

### D. Consideration of Food Stamp "Bonus" as Income

Plaintiffs state that the IDPA denied at least 185 applications from 30 downstate counties for shelter exceptions, because the applicant could "meet the difference between actual shelter costs and the statutory maximum by participating in the food stamp program." Stip. 102. These applications were denied even though IDPA's published regulations did not provide for the taking into account of participation in the food stamp program.

In particular, plaintiffs assert that consideration by the IDPA of the "bonus value" of the food stamps (the difference between the "purchase price" and their face value) as "income" available to AFDC recipients in the denial of shelter exceptions violated 7 U.S.C. § 2019(d), 7 C.F.R. § 271.-1(c), and 42 C.F.R. § 233.20(a)(4)(ii)(a). Plaintiffs claim that the refusal to provide shelter exceptions in this circumstance improperly reduced the IDPA's standard of need for shelter.

■ Because class action certification was previously denied and because no named plaintiff has a claim arising from IDPA's consideration of the food stamp "bonus," no "case or controversy" exists between plaintiffs and defendants concerning consideration of the food stamp bonus as income. *Sosna v. Iowa,* 419 U.S. 393, 402, 95 S.Ct. 553, 42 L.Ed.2d 532. Defendants' motion for summary judgment is granted on this issue.

### E. Consideration of Exempt Earned Income

As a work incentive, states participating in the AFDC program are to disregard a portion of the gross income earned by an AFDC recipient in calculating an applicant's need for an AFDC grant. 42 U.S.C. § 602(a)(8)(A); 45 C.F.R. § 233.20(a)(11). Plaintiffs state that IDPA denied at least 214 shelter exceptions from 30 downstate counties, because the applicant "could meet the difference between actual shelter cost and statutory maximum with exempt earned income." Plaintiffs contend that this treatment of exempt earned income is contrary to federal statutory and regulatory law.[15] Plaintiff Mary Gunlogson was

---

**14.** Defendant IDPA contends that plaintiff Metcalf has been fully compensated for any denial of an excess rent grant so that her claim is moot. In October, 1973, Metcalf's excess rent grant was terminated and her monthly public assistance grant was reduced by $51.00 to reflect the flat grant calculation of the CSP. She took an administrative appeal of the termination of her excess rent grant, and on April 5, 1975, an administrative decision found that the termination of her excess rent grant was improper. The IDPA paid Metcalf the difference between what she received and her actual rent for the twenty-six month period from October, 1973, to November, 1975, paying a grant of $13.56 per month. Because the figures used for the CSP did not take into account the receipt of an excess rent grant in January and February of 1973 by Metcalf, the alleged illegal-

ities in relation to Metcalf were perpetuated in the CSP and are at issue here.

**15.** From the IDPA's denial of 214 applications for excess rent grants from 30 downstate counties because of the consideration of exempt earned income, plaintiffs in their memorandum in support of summary judgment, at 28 n. 13, extrapolate to 720 denials for 101 downstate counties and 2,730 denials including Cook County. Because the "Request For Approval Of Shelter Expense In Excess Of State Maximum" form used by the IDPA in 101 counties, excluding only Cook County, sought information on whether the AFDC recipient seeking a shelter exception was willing to apply all or part of the earned income exemption toward excess shelter cost, the extrapolation for downstate counties may be accurate. Exhibit 12. Nonetheless, the extrapolation to include

denied a shelter exception whereby her earned income exemption was considered as being available to meet the cost of her shelter over the statutory shelter maximum. Exhibits 110, 112.

IDPA specifically sought on the form for "Request For Approval Of Shelter Expense In Excess Of State Maximum" to determine whether the AFDC recipient seeking a shelter exception was willing to apply all or part of the earned income exemption toward excess shelter cost. Exhibit 12. Mary Gunlogson was subject to this form in her application for a shelter exception because the DCDPA used this form provided by the IDPA. Nonetheless, the CCDPA did not consider the earned income exemption in its determination whether an AFDC recipient should receive an excess rent grant so far as its forms are concerned. Exhibits 3 & 10. In addition, plaintiffs do not present any claim that a recipient in Cook County was denied a shelter exception by the taking into account of an earned income exemption.

IDPA improperly considered the earned income exemption mandated by 42 U.S.C. § 602(a)(8) in determining the standard of need for shelter. A state may not create certain exceptions to standards specifically enunciated in the federal Act. 42 U.S.C. § 602(a)(10); *Jefferson v. Hackney*, 406 U.S. 535, 545, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). Because the shelter exception was part of Illinois' standard of need, the failure to pay the exception because of the presence of exempt earned income effected the determination of need rather than the level of benefits to be awarded a recipient. Although the IDPA properly calculated AFDC recipient's *need* in accordance with the requirements of 42 U.S.C. § 602(a)(8)(A) (the earned income disregard provision), it circumvented the requirements by providing that *payments* for shelter needs were

limited, in the case of working recipients, to the extent that the difference between actual shelter costs and the statutory maximum could be met by exempt earned income.[16] *See McGraw v. Berger*, 537 F.2d 719, 723–24 (2d Cir. 1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1110, 51 L.Ed.2d 542 (1977).

Plaintiffs will be granted summary judgment on this issue against defendants IDPA and DCDPA. Summary judgment will also be granted to defendant CCDPA on this issue.

### F. Granting Exceptions Only for Standard Housing

The IDPA and CCDPA granted shelter exceptions only for "standard" housing, *i. e.,* housing that was in compliance with the local building code. Exhibits 5 & 7-IDPA; Exhibit 96-CCDPA. In Cook County, shelter exceptions were also denied for overcrowded housing. Stip. 93. In addition, prior to the CSP *all* rent allowances could be withheld by the IDPA when building violations were discovered and not corrected in a timely fashion by the landlord in dwellings occupied by welfare recipients. Ill.Rev.Stat. ch. 23, § 11–23.

Plaintiffs argue that the rent withholding statute was not fully enforced and that shelter exceptions were not provided for substandard housing despite the lack of an adequate supply of standard housing. Thus, plaintiffs argue that AFDC recipients who were denied a shelter exception for living in substandard housing were deprived of a livelihood compatible with health and well-being contrary to the Illinois Public Aid Code.

At an earlier point in these proceedings, plaintiffs argued that the granting of shelter exceptions only to AFDC recipients who lived in standard housing was unconstitu-

---

Cook County is unreasonable because the forms used by the CCDPA to determine whether a shelter exception should be granted did not seek information about the earned income exemption or other sources of income. Exhibits 3 & 10.

**16.** The court decides only that denial of a shelter exception because of the availability of exempt earned income was improper whether or not the grant of a shelter exception was required consistent with the health and well-being of an AFDC recipient who had exempt earned income taken into account.

tional. At that time, the court held that plaintiffs' claim was not an adequate basis for a claim of invidious discrimination. *Metcalf v. Swank,* 305 F.Supp. 785, 790 (N.D.Ill.1969), *aff'd,* 444 F.2d 1353 (7th Cir. 1971), *vacated and remanded on other grounds,* 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 1113 (1972). As this court held then, and holds now, "the requirement that a dwelling must meet minimal standards for human habitation before its occupant can receive an exception to the shelter allowance *maximum* is hardly an adequate basis for a claim of invidious discrimination." *Id.*

The actual effect of IDPA's policy to grant shelter exceptions for standard housing only may have resulted in some AFDC recipients not receiving shelter exceptions who should have received them. Nonetheless, plaintiffs make no claim that *anyone* was actually denied a shelter exception for living in substandard housing. Moreover, the IDPA decision to deny grants for substandard housing was rationally based because payments for this housing would "subsidize" slum landlords and contribute to inflationary pressures on rent. Exhibit 99. In addition, when the CCDPA was faced with the insufficiency of "standard" housing, shelter exceptions were made even for nonstandard housing. Stip. 94; Exhibits 96 and 103. Plaintiff Metcalf's apartment was found to be standard despite a determination by a Housing Consultant Investigator that her apartment had the building code violation of falling plaster. Exhibit 58. Because the shelter exception policy was to make an individual determination so that exceptions were sometimes granted for substandard housing contrary to defendants' official policy and because no plaintiff was denied a shelter exception for living in substandard housing, plaintiffs have no cause for complaint on this issue. Similarly, the failure of Illinois'

rent withholding policy for substandard housing to be fully enforced and the decision of the IDPA to grant shelter exceptions only for standard housing and to grant shelter exceptions in individual cases for substandard housing did not result in the unfair pricing of the standard of need for shelter.[17] Summary judgment is granted to defendants on this issue.

### G. Quota on the Number of Shelter Exceptions Granted

In the establishment of a shelter maximum in Ill.Rev.Stat. ch. 23, § 12–4.11, provision was also made for the Legislative Advisory Committee, established pursuant to Ill.Rev.Stat. ch. 23, § 12–14, to make adjustments to the maximum. The Committee established a quota for the number of excess rent grants which was progressively increased from 225 in August, 1966, to 3,975 in March, 1973. Stip. 70. In addition, the CCDPA occasionally approved excess rent grants in excess of the quota set by the Legislative Advisory Committee. Stip. 71.

Plaintiffs argue that the quota system distributed shelter exceptions in an inequitable manner, because identically situated individuals were treated differently. They argue that the quota was in violation of the 42 U.S.C. § 602(a)(10) requirement that a state provide assistance "with reasonable promptness to all eligible individuals," and the requirement of 45 C.F.R. § 233.20(a)(1) and (2)(v) that the amount of assistance be determined on an objective and equitable basis and that special need items "be considered in the need determination for all applicants and recipients requiring them."

At an earlier point in these proceedings, plaintiffs made a similar claim that the number of excess rent grants was inadequate. Because plaintiffs did not allege that excess rent grants had been exhausted or were no longer available to large families

---

**17.** To the extent that plaintiffs' argument is that the standard of need for shelter was not fairly priced because AFDC recipients live in substandard housing, the court in *New Jersey Welfare Rights Organization v. Cahill,* 349 F.Supp. 501, 511 & n. 7 (D.N.J.1972), *aff'd,* 483 F.2d 723 (3d Cir. 1973), has considered this argument. The court determined that despite the tragedy of substandard housing, nothing in 42 U.S.C. § 602(a)(23) indicates that the AFDC statute was designed to cure all the ills of poverty.

or that they were denied the grants because the number available was inadequate, a constitutional claim was not stated. *Metcalf v. Swank,* 305 F.Supp. 785, 789–90 (N.D.Ill.1969), *aff'd on other grounds,* 444 F.2d 1353 (7th Cir. 1971), *vacated and remanded on other grounds,* 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 1113 (1972). The plaintiffs now argue that excess rent grants were exhausted so that the number of available shelter exceptions was inadequate.

Plaintiff Ella Metcalf sought a shelter exception to pay actual rent in March, 1972, after her previous shelter exception was terminated upon her move to a new apartment. Although a written request for an excess rent grant was made in March, 1972, and Metcalf had previously been receiving an excess rent grant, no action was taken on her request until March, 1973, when she was granted the shelter exception. The one year delay from the date Metcalf requested an excess rent grant until the authorization of the grant reflects the quota limitations on excess rent grants. *See* Exhibit 100 for a report on the shelter exception quota and the continued updating of the quota to increase exceptions. Thus, this issue is now properly before the court.

■ Because the Illinois standard of need included shelter exceptions for those requiring them consistent with health and well-being, Illinois was required to grant exceptions to all those AFDC recipients who were entitled to exceptions. Federal law mandates the provision of AFDC assistance to *all* eligible individuals. 42 U.S.C. § 602(a)(10); *Jefferson v. Hackney, supra,* 406 U.S. at 545, 92 S.Ct. 1724.

If the number of shelter exceptions set by the Legislative Advisory Committee always exceeded the number of eligible recipients, then there would be no federal violation in Illinois' quota system. Because shelter exceptions were denied due to the lack of available exceptions, defendants violated federal statutes and regulations.[18] In addi-

tion, correspondence between successive CCDPA and IDPA directors reveals that IDPA's shelter exception quota was filled almost immediately after it was raised. Exhibits 78, 81, 82. In fact, in May, 1972, the quota was only raised enough to cover a backlog of pending applications with no new applications approved for the remainder of 1972. Thus, the quota policy impacted on plaintiff Metcalf's failure to obtain a shelter exception in 1972. Moreover, after the CSP, the Department of Health, Education and Welfare pointed out to Joel Edelman, the acting director of IDPA, in a letter of April 18, 1974, that the presence of the quota system for shelter exceptions raised questions of compliance with 45 C.F.R. 233.20(a)(2)(i), (iii), and (v). The Department stated that by the use of the quota system, IDPA improperly treated similarly situated individuals differently in budgeting assistance. Exhibit 18. Accordingly, summary judgment is granted to plaintiffs on this issue.

### H. Equal Protection Challenge to the Quota System

The determination that the quota system employed by the IDPA in the granting of shelter exceptions violated federal statutory and regulatory law makes unnecessary consideration of the equal protection grounds raised. The court indicates no view on the merits of these grounds. *King v. Smith,* 392 U.S. 309, 333, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Townsend v. Swank,* 404 U.S. 282, 285, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971).

### I. Shelter Exceptions Consistent with Health and Well-Being and Due Process Challenges

1. The Health and Well-being Standard

■ Upon the initial challenge to the IDPA shelter maximum of $90 per month for those on AFDC, the three-judge court in *Metcalf v. Swank, supra* at 270, found that the maximum provision was constitutional

---

**18.** IDPA denied at least 117 excess rent grants in 30 of the 101 counties outside of Cook County because there was no available exception and at least 395 excess rent grants in the same

30 counties because "due to the limited number of exceptions, only cases of large families are being considered." Stip. 102.

when read in conjunction with the purposes of the Public Aid Code to provide "a livelihood compatible with health and well-being for persons eligible for financial aid."[19] Exceptions to the shelter maximum were to be granted consistent with these purposes if shelter was unavailable at or below the maximum set. After the decision, as of January 2, 1969, the IDPA provided that the shelter maximum could be exceeded "if it can be established that adequate housing for large families is temporarily unavailable within the state maximum." Exhibit 5. The shelter maximum was increased to $97 per month as of August 27, 1970, with the same applicable standard. Stip. 68; Exhibit 6.

Plaintiffs assert that prior to the CSP when actual cost of rent exceeded the shelter maximum, IDPA was *required* by the terms of the Public Aid Code and by the decision of *Metcalf v. Swank, supra,* to grant exceptions to the shelter maximum. In plaintiffs' reply memorandum, their argument is reformulated to state that prior to the consolidation defendants were required to grant an excess rent grant necessary to defray actual rent unless actual rent was unreasonably high. In other words, plaintiffs contend that shelter exceptions were to be granted automatically without the necessity of an application, unless the exception was unnecessary to provide a livelihood compatible with health and well-being.

Plaintiffs further assert that because defendants denied shelter exceptions for arbitrary reasons prior to the CSP, the standard of need for shelter incorporated into the CSP was improperly derived. In addition, plaintiffs contend that the IDPA denied them shelter exceptions by an unfettered

and arbitrary exercise of discretion violating the due process clause of the fourteenth amendment.

Defendants respond in their memorandum in support of summary judgment, at 19, to plaintiffs' arguments by asserting that the decision of the three-judge court in *Metcalf v. Swank, supra,* "only required that exceptions be granted or denied through the wise exercise of the discretion of IDPA and in accordance with standards which reflect the purpose of the Public Aid Code 'to provide a livelihood compatible with health and well-being.'" They contend that exceptions were not to be granted "automatically" to anyone paying more for shelter than the shelter maximum. Defendants further contend that the CSP fully reflected the prior standard of need by including expenditures for cases where shelter was budgeted above the maximum.

■ Plaintiffs have a property interest in the shelter exceptions protected by due process requirements to the extent that they have a "legitimate claim of entitlement" under the legislation creating the benefits. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Winston v. United States Postal Service,* 585 F.2d 198, 208–09 (7th Cir. 1978). Although the inquiry whether to grant a shelter exception was clearly an individualized one, AFDC recipients applying for shelter exceptions had a legitimate claim of entitlement to an exception to the extent required by the statutory guideline to provide exceptions consistent with health and well-being.

At an earlier point in these proceedings, plaintiffs claimed that the shelter exception program was administered in an unconstitu-

---

**19.** The Seventh Circuit Court of Appeals at an earlier point in these proceedings pointed out that under *Dandridge v. Williams, supra,* "decided after the three-judge opinion was issued, a statute imposing a flat maximum would not be *per se* unconstitutionally arbitrary." *Metcalf v. Swank,* 444 F.2d 1353, 1354 n. 3 (7th Cir. 1971), *vacated and remanded on other grounds,* 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 1113 (1972). The Seventh Circuit went on in the text to state, "The court further construed the statute to require the granting of such exceptions whenever necessary to 'provide a livelihood compatible with health and well-being,' as stated in section 12–4.11." *Id.* at 1354. Although the flat shelter maximum is no longer *per se* unconstitutional, the shelter maximum must still be read in conjunction with Ill.Rev. Stat. ch. 23, § 12–4.11, to require the granting of shelter exceptions whenever necessary to "provide a livelihood compatible with health and well-being."

tional manner, because recipients of AFDC benefits had to request exceptions instead of receiving them as a matter of course. The court found plaintiffs' argument patently frivolous stating, "The same argument might be advanced against requiring a prospective public aid recipient from following any application procedures, and submitting to any investigation of his eligibility for any form of public aid." *Metcalf v. Swank,* 305 F.Supp. 785, 790 (N.D.Ill.1969), *aff'd,* 444 F.2d 1353 (7th Cir. 1971), *vacated and remanded on other grounds,* 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 1113 (1972). Requiring an application process prior to the determination whether a shelter exception would be granted was proper. This is because the standard of need prior to the CSP was not actual cost of shelter but was a shelter maximum and exceptions consistent with health and well-being for those requesting exceptions. *See Metcalf v. Swank,* 444 F.2d 1353, 1358 (7th Cir. 1971), *vacated and remanded on other grounds,* 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 1113 (1972).

■ By having an AFDC recipient apply for a shelter exception, the IDPA could evaluate the necessity for the exception in the circumstances, and if necessary, the recipient could appeal an unfavorable result. Because the IDPA had a procedurally fair system of requiring that shelter exceptions be requested, the grant or denial of a shelter exception based on reasons, and the possibility of appeal, due process was not violated by the mere exercise of discretion. Nonetheless, defendants had to exercise their discretion to treat applicants for shelter exceptions fairly and consistently to satisfy due process requirements. *White v. Roughton,* 530 F.2d 750, 754 (7th Cir. 1976).

The individual plaintiffs contend that they were denied shelter exceptions for impermissible or unstated reasons contrary to the state statutory standard to provide a livelihood compatible with health and well-being and to the federal AFDC act and regulations. Determination on these grounds makes consideration of plaintiffs' due process claim that defendants operated the shelter exception program without clear standards unnecessary.

Of particular note is the IDPA's administrative affirmance of the denial of a shelter exception over the maximum to plaintiff Gunlogson. The IDPA determined that Gunlogson's citation of the statutory standard to provide shelter exceptions consistent with the Illinois Public Aid Code guideline of health and well-being, as interpreted by the Seventh Circuit Court of Appeals in *Metcalf v. Swank, supra,* lacked merit. The IDPA determined that the grant of the shelter maximum of $97 was sufficient despite Gunlogson's payment of $215 per month for shelter and her claim that she could not find acceptable housing within the shelter maximum in DuPage County. Exhibit 112. Although the major reason for the denial of a shelter exception to Gunlogson was the impermissible taking into account of an earned income exemption, as discussed *supra,* the determination of the inapplicability of the statutory standard as interpreted by the Seventh Circuit suggests that the IDPA disregarded the court's determination that shelter exceptions were to be granted consistent with health and well-being. This disregard occurred despite Gunlogson's claim that she could not find adequate shelter within the shelter maximum in DuPage County.

■ Defendants were under a duty to provide all eligible AFDC recipients who applied for shelter exceptions with these benefits as part of the state standard of need. 42 U.S.C. § 602(a)(10); *Martinez v. Trainor,* 435 F.Supp. 440, 445 (N.D.Ill.1976), *appeal dismissed,* 556 F.2d 818 (7th Cir. 1977). Thus, if plaintiffs were eligible claimants for shelter exceptions and they were denied benefits, then the acts of defendants violated 42 U.S.C. § 602(a)(10), because to deny an "eligible individual" any aid is to refuse to furnish aid with reasonable promptness. *Gunlogson v. Apostalos,* Memorandum and Order of June 26, 1974, at 15.

■ Defendants were required to take into account the following standards in determining the eligibility of claimants for

shelter exceptions. First, although the IDPA did not make shelter exceptions available to all AFDC families unable to find shelter within the maximum, Stip. 93(j), this action was appropriate only insofar as the overriding consideration in the grant or denial of a shelter exception was the applicant's need for an exception consistent with health and well-being. Second, plaintiffs and other AFDC recipients who applied for shelter exceptions and who needed the grant to provide a livelihood compatible with health and well-being were entitled to exceptions, unless defendants could demonstrate that adequate housing was available at or below the shelter maximum.[20] Third, the defendants were not required to grant a shelter application if the application was for payment of an unreasonably high shelter amount.

▮ Because of the artificial constraint of the quota system upon the number of shelter exceptions granted, the IDPA could not have consistently applied the statutory standard of granting exceptions to provide a livelihood compatible with health and well-being. Furthermore, the failure of defendants to have furnished a detailed set of instructions to caseworkers to determine whether an exception should be granted to the shelter maximum suggests that exceptions were granted or denied in an arbitrary manner. Stip. 77–82. In fact, at the time of the CSP, 441 excess rent requests were left unconsidered. Stip. 101. The failure even to examine the merits of these requests strongly suggests the arbitrary action that applicants for shelter exceptions were subjected to. These procedural inadequacies in the administration of the shelter exception program denied shelter exceptions to eligible AFDC recipients contrary to 42 U.S.C. § 602(a)(10).[21] Thus, it is likely that shelter was accounted for in the averaging of individual grants for purposes of the CSP at less than the statutory standard of need, contrary to the *Rosado v. Wyman, supra,* requirement of "fair pricing." *See New Jersey Welfare Rights Organization v. Cahill, supra* at 512.

2. Shelter Exception Standards

Plaintiffs contend that the failure to inform AFDC recipients of the availability of shelter exceptions violated due process. Plaintiffs further contend that the IDPA promulgated no written, articulate standards for the grant or denial of shelter exceptions contrary to Ill.Rev.Stat. ch. 23, § 12–13, requiring the IDPA to "make all rules and regulations . . . necessary . . . [to carry] out the provisions of the Illinois Public Aid Code" and contrary to 45 C.F.R. § 205.70 requiring that regulations be public and available for examination.

▮ The risk of arbitrary decisionmaking was inherent in the procedure used by

---

**20.** Defendant CCDPA denied plaintiff Metcalf's request for an excess rent grant on June 10, 1968, on the ground that adequate housing was available for less than her actual shelter cost above the shelter maximum. Exhibit 59. This would be an adequate ground for the denial of a shelter exception. Subsequently, prior to January, 1970, Metcalf received an excess rent grant sufficient to pay the difference between her actual rent and her previous shelter allowance.

**21.** The parties have stipulated that there were many AFDC recipient families paying shelter costs greater than the shelter maximum who had not received excess rent grants. Stip. 118. A survey conducted in October, 1972, of 588 downstate and 964 Cook County AFDC recipient families showed that downstate 13.3 percent of the AFDC recipients were paying an average of $21.51 per month for shelter in excess of the shelter amount provided by the IDPA (3 percent of the total downstate and Cook County sample were receiving excess rent grants) and that in Cook County 32.1 percent were paying an average of $25.09 per month for shelter in excess of the shelter amount provided by the IDPA. Exhibit 24. In addition, an AFDC study conducted by the Department of Health, Education & Welfare in January, 1973, showed that 62 percent of Illinois AFDC recipients had shelter and/or fuel and utilities requirements between $110–149, with the remaining 38 percent having requirements below $100. Exhibit 20, Table 18. These studies suggest that a substantial number of AFDC recipients had shelter needs greater than the maximum. Some of these AFDC recipients who were paying more for shelter than they were receiving may have been denied shelter exceptions after application for reasons inconsistent with the Illinois Public Aid Code standard of "health and well-being."

the defendants. Plaintiffs Gunlogson, Coleman, and Robinson were never advised orally or in writing by their caseworkers that they could receive an exception to the shelter maximum. Stip. 17, 45, and 52. The IDPA and the CCDPA failed to provide any written or formal notice of standards or procedures to AFDC recipients concerning the excess rent grants. Stip. 84. In addition, neither the IDPA nor the CCDPA had an application form for an excess rent grant to be distributed to AFDC recipients. Stip. 85. Thus, defendants failed to fully implement the statutorily mandated shelter exception program by not making the necessary rules and regulations contrary to Ill. Rev.Stat. ch. 23, § 12–13. The defendants further violated 45 C.F.R. § 205.70 by not even having regulations that could be made available for examination. The Illinois statute providing for exceptions to the shelter maximum did not contemplate having exceptions available and at the same time, providing little or no information about the exceptions to those who would benefit from the exceptions. Although defendants acted properly by requiring an application for a shelter exception as discussed *supra,* some eligible AFDC recipients never applied for shelter exceptions because of the failure of the defendants to inform them of the availability of the exceptions. This procedure denied aid to eligible individuals contrary to 42 U.S.C. § 602(a)(10). *See also Carey v. Quern,* 588 F.2d 230, 232 (7th Cir. 1978).

### 3. Survey

■ Plaintiffs argue that in calculating the standard of need for shelter for purposes of the CSP, the IDPA was required to survey actual shelter payments made by AFDC recipients. In its consolidation process the IDPA did not conduct any study or survey to determine the number of families

paying more for shelter than the shelter maximum and not receiving excess rent grants. Stip. 110. The IDPA was not required to conduct a survey of shelter needs of AFDC recipients to determine the standard of need for shelter for purposes of the CSP.[22] This is because the IDPA did not pay actual rental cost in its preconsolidation standard of need for shelter and because the IDPA properly required AFDC recipients to apply for excess rent grants rather than providing them to all AFDC recipients paying more for shelter than the shelter maximum.

### 4. Conclusion

Summary judgment is granted to plaintiffs on the issue of the failure of defendants to provide shelter exceptions consistent with health and well-being and on the issue of the failure of the defendants to inform AFDC recipients of the availability of shelter exceptions contrary to 42 U.S.C. § 602(a)(10) and Ill.Rev.Stat. ch. 23, § 12–4.-11. Summary judgment is granted to defendants on the issue of the failure of the defendants to conduct a survey of shelter needs of AFDC recipients prior to the CSP.

## V. CLAIMS CONCERNING THE SSP

Until January 1, 1974, Title VI of the Social Security Act, 42 U.S.C. § 801 *et seq.,* provided for a program of Aid to the Aged, Blind and Disabled [hereinafter AABD] whereby financial assistance and ancillary benefits were provided to needy individuals who are 65 years of age and over, blind, or disabled. Illinois participated in the federal AABD program until January 1, 1974. Stip. 58. On January 1, 1974, the AABD program was superseded by Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.,* which provided for a federally admin-

---

**22.** The decision in *Roselli v. Affleck,* 373 F.Supp. 36, 48 (D.R.I.), *aff'd,* 508 F.2d 1277 (1st Cir. 1974), is distinguishable. The court's decision to require a survey of actual rent paid was based on a determination that Rhode Island paid rental cost equal to the actual cost of rent as their standard of need and that the budgeted rent figure used in the consolidation process was substantially less than the actual cost of rent. The standard of need in Illinois for shel-

ter was not equal to actual shelter cost consistent with health and well-being. Because the standard was shelter cost up to a shelter maximum with exceptions to be granted to those who applied and required an exception consistent with the guidelines of health and well-being, IDPA did not have to make a survey or study prior to the consolidation process of the CSP.

istered and funded program of Supplemental Security Income (SSI) through which financial assistance is provided to needy individuals in the same categories as the AABD. In addition, to the federal SSI program, Illinois has provided financial assistance and ancillary benefits to needy' individuals also in the same categories as the AABD through the Supplemental Security Program (SSP) pursuant to the Illinois Public Aid Code, Ill.Rev.Stat. ch. 23, § 3–13.[23] Because the level of benefits paid to SSP recipients are not effected by the AFDC program, the consolidation of the separate components of the AFDC grants in Illinois into a unitary grant in 1973 had no effect on the SSP level of benefits. Stip. 104.

On September 8, 1975, plaintiffs were given leave to amend their complaint to add Margeree Brown as a party plaintiff. Brown receives federal SSI as a disabled person and receives state assistance under the SSP. She raises claims concerning the administration of the shelter allowance program under the SSP.

In calculating SSP grants, the IDPA imposed a maximum of $97.00 a month on the shelter component of the grant. Stip. 112. Only after a formal administrative appeal from the denial of an excess rent grant did the IDPA Chief of the Bureau of Program Planning have the authority to approve excess rent grants for SSP recipients. Stip. 117. Between October 1, 1973, and July 23, 1975, the IDPA Chief of the Bureau of Program Planning approved four excess rent grants and denied two. Only one other request was received by the Bureau of Program Planning between these dates. The request was referred back to the district office to determine whether the applicant was eligible for SSP. Stip. 117. Between January 1, 1975, and April 4, 1977, no written IDPA policy provided that an SSP recipient might receive an excess rent grant or discussed any procedure by which an excess rent grant might be obtained. In addition, no form was specifically designed for requesting an excess rent grant for an SSP recipient and no written or formal notice of the standards or procedures for obtaining an excess rent grant was provided to SSP applicants or recipients by officials of the IDPA or the CCDPA. Stip. 115.

Defendants in their motion for summary judgment admit that at the time plaintiffs filed their motion for summary judgment defendants did not have any specific written policy for SSP shelter exceptions or any definition of the standards of eligibility for granting exceptions. Nonetheless, defendant IDPA claims that it considered plaintiff Brown's request for a shelter exception on its merits upon reconsideration and that her request was denied for reasonable cause.

After the submission of plaintiffs' motion for summary judgment in this cause, the IDPA on April 4, 1977, established a regulation setting forth standards for the granting of an SSP excess rent grant. The new policy provides:

*Excess Shelter Allowance*

A recipient who is eligible for and receiving an SSP may be eligible, if the need is verified, for payment of shelter expenses in excess of the maximum allowance provided:

> The recipient suffers from a particular infirmity, such as blindness, or has necessity for using a wheelchair or is otherwise unable to negotiate stairs; and Suitable housing necessitated because of the infirmity is available only at an expense in excess of the maximum allowance.

> An excess shelter allowance may only be authorized upon receipt of prior approval from the Special Projects Unit. This need may only continue to be met while the individual remains a recipient having unmet needs in addition to the amount of excess shelter expenses and continues to reside in the approved shelter arrangement. Exhibit 145.

---

**23.** With the change from the AABD to a federal SSI and a state SSP, the SSP no longer receives federal subsidies. Thus, the Social Security Act and the regulations adopted pursuant to the Act are no longer applicable to the SSP claims. Plaintiffs now claim violations of the due process and equal protection clauses of the fourteenth amendment and Ill.Rev.Stat. ch. 23, § 12–4.11.

Defendants now claim that the changed regulation provides a statement of policy, the procedure to be followed, and standards of eligibility. Defendants argue that because the Illinois SSP policy is now proper and because plaintiff Margeree Brown has not applied under the policy, plaintiffs' SSP claims are moot. In addition, defendants contend that the new regulation satisfies what plaintiffs sought in their motion for summary judgment:

With respect to this SSP Program, IDPA must be required to issue regulations which make shelter exceptions available to all aged, blind and disable applicants for and recipients of assistance, who need them. If those regulations do not provide for payment of rent costs as incurred by aged, blind and disabled persons, they must clearly define the standards of eligibility for receiving shelter exceptions.

Defendants argue that its regulation now makes shelter exceptions available to all aged, blind and disabled applicants for and recipients of SSP who need them, and the standards of eligibility for the shelter exceptions are clearly defined.

Plaintiffs respond that defendants' recent action potentially making some excess rent grants available to SSP recipients is both substantively inadequate and comes too late in these proceedings to justify withholding injunctive relief. Plaintiffs challenge defendants' mootness argument because cessation of the previous practice came under the pressure of an impending court decision and because the new policy can be changed.

The mootness doctrine requires plaintiff's personal stake in the litigation to continue throughout the entirety of the litigation to satisfy the constitutional Article III requirement of a "case or controversy." *Sosna v. Iowa, supra,* 419 U.S., at 402, 95 S.Ct. at 559. Mootness often takes place after substantial time and energy have been expended towards a resolution of a dispute. *Rosado v. Wyman, supra,* 397 U.S. at 404, 90 S.Ct. 1207. The application of the mootness doctrine is appropriate here if plaintiff Brown does not continue to have a personal stake in the litigation which she had when she was named in the complaint.

Plaintiff Brown cannot obtain retroactive damage for any alleged illegalities from the denial of an SSP shelter exception because of eleventh amendment limitations. *Edelman v. Jordan, supra.* Nonetheless, plaintiffs seek injunctive relief despite the change in the SSP shelter exception policy. Plaintiffs assert that the case is not moot because the voluntary cessation of allegedly illegal conduct does not deprive a court of power to hear and determine a case. *United States v. W. T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

The Court in *United States v. W. T. Grant Co., supra,* did not hold that a case can never be mooted by the actions of a party taken after the commencement of an action. The Court stated that "the moving party must satisfy the court that relief is needed." *Id.* at 633, 73 S.Ct. at 898. Here, in light of the new policy, plaintiffs have not demonstrated that injunctive relief is necessary. Plaintiffs in their motion for summary judgment seek injunctive relief in the form of regulations by IDPA to make shelter exceptions available to SSP recipients who need them and to clearly define the standards of eligibility for receiving shelter exceptions. Plaintiff Margeree Brown requested and was denied a shelter exception as an SSP recipient when the IDPA did not have a shelter exception policy for SSP recipients. Subsequently, the IDPA promulgated a shelter exception policy for SSP recipients setting forth a statement of policy, the procedure to be followed, and standards for eligibility. Because consideration of Brown's SSP claim under a superseded policy is not actually compelled by the litigation before the court, plaintiffs' SSP claim is moot.

In addition, this case does not fall into the class of controversies that are not moot because they are "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Neither of the two elements necessary for the application of this stan-

dard in the absence of a class action are present. First, the challenged action, the denial of a rent exception to Brown as a participant in the Illinois SSP, was not too short in duration to prevent full litigation prior to cessation or expiration of the claimed illegalities. Second, there is no reasonable expectation that plaintiff Brown will be subjected to the same denial of a shelter exception under the new policy. If she is denied under the new policy, this court's determination that plaintiffs' claims as to an SSP violation are presently moot does not bar a new suit. *United States v. W. T. Grant Co., supra*, 345 U.S. at 635, 73 S.Ct. 894.

Because there is no plaintiff who has applied under the new regulation, no plaintiff has a case or controversy to determine whether the new regulation is unconstitutionally applied or whether the regulation does not provide shelter exceptions to SSP recipients consistent with the Illinois statutory guideline of health and well-being. Plaintiffs' argument that the new policy is substantially inadequate is more properly presented through a live controversy of an applicant for an excess rent grant under the new procedures. Defendants' motion for summary judgment as to the SSP claims is granted on mootness grounds.

## VI. CONCLUSION

The question of injunctive relief against defendants remains as to the heretofore found illegalities in defendants' administration of the Illinois AFDC shelter exception program to the extent that the illegalities were perpetuated in the present CSP. Because "the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this [c]ourt," *Dandridge v. Williams, supra*, 397 U.S. at 487, 90 S.Ct. at 1163, the court will place the burden on the parties to negotiate a remedial plan. The plan is to be based upon the legal determinations made herein and is to be designed to terminate this litigation and to achieve a settlement equitable to all concerned. If necessary, the court will seek the interven-

tion of the Department of Health, Education and Welfare, the federal administrator of the AFDC program, for assistance to the parties.

For the reasons stated, it is therefore ordered that the motion of plaintiffs for summary judgment shall be, and the same is hereby, granted in part and denied in part, and the motion of defendants for summary judgment shall be, and the same is hereby, granted in part and denied in part as heretofore stated in the statement of decision.